## The People v. Alexander Olmstead.

*Attempt to destroy unborn child: Manslaughter: Evidence: Appearance and surroundings of the deceased before death.* Upon the trial of a charge of manslaughter under the statute (*Comp. L. 1871,* § *7542*) making the attempt to destroy an unborn child in certain cases manslaughter where the death of such child or the mother is thereby produced, evidence of a woman who was with such mother and washed her and changed her clothes the day before she died, as to the appearance of the bed and clothes and as to a peculiar offensive odor which she observed, is held competent.

*Manslaughter: Evidence: Cause of death: Opinions.* But it is not competent to permit such a witness, without proof of any minute examination of the person of the deceased, or of any facts on which she based her opinion, or of any knowledge or experience in such matters, to give her opinion as to what ailed the deceased.

*Evidence: Dying declarations: Exclamations.* Dying declarations, to be admissible as evidence, must be such narrative statements as a witness might properly give on the stand if living; and the mere exclamation: "Oh, Aleck! what have we done? I shall die," is held under the circumstances of this case, not admissible as a dying declaration of facts.

*Witness: Impeachment: Statements out of court: General reputation.* Witnesses who have been impeached by a showing that they had given different statements out of court on material facts, and had testified differently on a former trial and examination, cannot be supported by proof of their general reputation for truth and veracity; the authorities sustaining a contrary doctrine are reviewed and criticised, and the question is discussed upon principle.

*Informations: Statutory offense: Attempts to destroy unborn child.* The information in this case, which simply alleges a felonious, willful and wicked killing contrary to the statute in such case made and provided, without in any way setting out the means or manner of causing the death, or referring specifically to the statute, is held insufficient, even under our liberal statutes on such pleadings, to support a conviction under the statute aforesaid, as to attempts to destroy an unborn child, etc.

*Constitutional law: Informations: Description of offense.* The constitutional provision requiring the accused in every criminal prosecution "to be informed of the nature of the accusation" is based upon a presumption of innocence, and upon the theory that an innocent man may be indicted as well as a guilty one, and that he will not be able to prepare for trial without knowing what he is to meet.

*Constitutional law: Statutes: Simplifying forms.* The statutes simplifying the forms of informations, etc., must be confined to the omission only of such matters as are not essential to give information of the nature of the accusation, and will not warrant the omission of averments essential to the description of the offense.

*Manslaughter: Acts of violence: Involuntary homicide: Indictments.* Where the offense charged consisted, as at common law manslaughter very generally did, of acts of violence, a very simple allegation was enough for the protection of the prisoner; but where the offense of manslaughter was involuntary homicide, and involved no assault, but arose out of some negligence or fault from which death was a consequential, and sometimes not a speedy result, the ordinary forms were deficient, and the indictment had to be framed upon the peculiar facts, in order to convey any adequate information.

PEOPLE *v.* OLMSTEAD.

*Statutory offenses: Attempt to destroy an unborn child: Manslaughter.* This statutory offense originated in the statute defining it, and could not have come within any of the descriptions of manslaughter at common law: and nothing short of allegations conforming to the statute, would be adequate to inform one accused of this offense.

*Informations: Practice: Record: Bill off exceptions.* As this information is not held bad upon its face, as applied to the ordinary homicide by assault, the question of its sufficiency does not arise directly upon the record, but on the bill of exceptions, for the defect was not apparent until the evidence came in; and the error, therefore, was in permitting a conviction on it.

*Heard October 15. Decided October 27.*

Exceptions from Branch Circuit.

*Isaac Marston, Attorney General,* for the People.

*N. P. Loveridge* and *L. T. N. Wilson,* for respondent.

CAMPBELL, J.

The respondent was informed against for manslaughter in killing one Mary Bowers, whom it is averred he did "feloniously, willfully and wickedly kill and slay, contrary to the statute in such case made and provided," etc. The information does not name the offense, nor the manner or means of its commission.

Upon the trial the prosecution, in opening, stated that the prisoner was charged under § *7542 of the Compiled Laws,* which is as follows:

"Every person who shall administer to any woman pregnant with a quick child any medicine, drug, or substance whatever, or shall use or employ any instrument or other means, with intent thereby to destroy such child, unless the same shall have been necessary to preserve the life of such mother, or shall have been advised by two physicians to be necessary for such purpose, shall, in case the death of such child or of such mother be thereby produced, be deemed guilty of manslaughter."

The preceding section makes the malicious killing of an unborn quick child manslaughter, if done by an injury to the mother which would have constituted her murder if she had died.

The succeeding section makes all unnecessary attempts to produce the miscarriage of a pregnant woman, whatever may be the result, punishable as a misdemeanor.

The distinction, therefore, is clearly taken, as depending on the intent to destroy a living unborn child, and supplies a defect at the common law, whereby such attempts were not felonious, and in some cases, at least, may not have been punishable at all.

The elements of the crime, as applied to the case before us, are found in the death of the mother, produced by acts intended to destroy a quick child; that term being used in the statute as an unborn child liable to be killed by violence. The ambiguity which, according to Mr. Bishop, seems to exist in some statutes, as to the fœtal condition, is not found in our statutes, which cover the whole ground by different provisions.— *Comp. L.,* §§ *7541, 7542, 7543; Bishop on Statutory Crimes,* §§ *742–750, and cases.*

The case was presented to the jury upon circumstantial evidence entirely, the cause of death being proved by medical testimony from a *post mortem* examination, and the connection of respondent with it being also inferential.

Upon the trial one Lucy Stone was sworn as a witness, who testified to having been sent for by respondent on the day before the deceased died, to wash her and change her clothes. She testified to certain appearances upon the bed and clothing, and to a peculiar offensive odor which she said she had never noticed before at any time or place, although she had noticed something like it. This testimony was objected to, but we think it was allowable as going to show, in some degree, the condition of the deceased, and as a circumstance which was not irrelevant, and which might possibly be material with other proofs.

But without proof of any minute examination of the person of the deceased, or any facts on which she based her opinion, or of any knowledge or experience which might enable her to form an opinion, this same witness was allowed to answer the following question: "Will you state

what in your opinion was the matter with Mrs. Bowers at that time?" Her reply was: "My opinion was that she had lost a child."

It is impossible to find any reason for receiving such proof. It involved an opinion which no medical man could give without a very full examination. It also undertook to show more than a mere miscarriage.

No witness, medical or otherwise, can be allowed to give testimony from his observation concerning the nature of a person's illness or its causes, without proof both of a sufficient examination, and such knowledge or experience as will qualify him to offer an opinion. This woman may or may not have possessed such knowledge as would allow her to give an opinion upon some of the medical questions involved in her answer, but she gave no proofs of her knowledge, and gave no testimony upon which it could be inferred that her observation was such as would have justified any one in expressing an opinion. Whether it is within the power of medical science to determine from mere observation that there has been a miscarriage of a quick child, is a question we need not consider. It is certain that any competent physician would be very guarded in offering such an opinion. It is impossible to avoid the belief that the witness answered from her suspicions, and not from observation alone; and the question allowed to be put did not confine her to any such source of knowledge or inference. There is no occasion to review authorities upon so plain a case.

Objection was also made to the reception of testimony from Mrs. Belinda Wheeler as to what was claimed to have been a dying declaration. This witness swore she was alone in the room with deceased the day before her death. Her account is as follows: "She was lying with her eyes shut. She did not open her eyes, and I put my hand on her wrist to see if I could feel her pulse, and then she spoke and says: 'Oh, Aleck! what have we done? I shall die.' I went away in a few minutes after that." And being

further examined, she testified : " She did not open her eyes the last time I was there" [which was the time in question] "or say any thing else. I did not say any thing." This is the whole proof, except some cross-examination about witness' statements on other occasions, bearing upon the existence of delirium.

Dying declarations, as is well settled, are neither more nor less than statements of material facts concerning the cause and circumstances of homicide, made by the victim under the solemn belief of impending death, the effect of which on the mind is regarded as equivalent to the sanction of an oath.   They are substitutes for sworn testimony, and must be such narrative statements as a witness might properly give on the stand if living.—See *People v. Knapp, 26 Mich., 112, and cases cited;* also *Hurd v. People, 25 Mich. R., 405.*

The so-called declaration admitted here was entirely destitute of any feature of testimony in the proper sense of the term.   There is nothing to indicate that it referred to the cause of death.   It was not made for the purpose of explaining any act connected with the death.   It formed no part of any conversation, and was called out by no question or suggestion, and does not purport to be a narrative of any thing.   Neither is there any thing to indicate that it was made for any purpose, or in view of any expectation of death, or that the deceased knew to whom she was speaking, or that she meant to speak to any body.   It is not even evident that she was awake or in her senses. The exclamation, if made in the manner described, is such a one as might naturally come from a person in agony, whose attention was completely distracted from the persons and things about her; and might easily have come from one quite unconscious of such matters.

It would be extremely dangerous, and contrary to every rule of evidence, to allow such an exclamation to be received as a dying declaration of facts, and to allow it to be eked out by suspicions and inferences, as was done here, so as to

allow the jury to act upon it as if she had solemnly charged the respondent with being the author of her death, in the manner charged against him.

Two witnesses, Hattie Sweet and Belinda Wheeler, had been sworn for the prosecution, and evidence had been given by the defense to show that they had given different statements out of court upon material facts, and that one of them had testified differently on a former trial and examination. The court, against objection, allowed their credit to be supported by proof of general reputation for truth and veracity.

This we think was error. It is defended on the strength of certain intimations of *Mr. Greenleaf* (*1 Greenl. Ev.*, § *469*), and cases to which he refers. The origin of the doctrine, that the general good character of a witness may be shown in answer to any kind of impeachment, seems to be referred to *Rex v. Clarke, 2 Starkie R., 241*, and to a reference in *Starkie's Evidence* to that case, as supporting it. And some decisions in this country appear to favor it.

But that case, if it be received as authority, decides nothing of the kind. It only holds that where a witness has been asked questions on cross-examination directly tending to discredit his character,—as, for example, whether he has been convicted of crime, or done acts which might disgrace him,—his good character may be shown to remove suspicions that might arise from that course of examination. It was not a case where a witness had been impeached by proof of contradictory statements; and there is no strong analogy between those two examples.

The question has been amply discussed in New York and Massachusetts, and settled against such a practice. The matter was first considered, but not decided distinctly, in *People v. Rector, 19 Wend., 569*. In *People v. Hulse, 3 Hill, 309*, it was again disputed, and the doctrine settled against allowing the testimony. *Bronson, J.*, gives some forcible reasons for that conclusion, while *Cowen, J.*, was for receiving it, as he had intimated in *People v. Rector*.

In *Starks v. People, 5 Denio, 107,* the court unanimously adhered to the ruling in *People v. Hulse,* and adopted the opinion of *Judge Bronson.* In *7 N. Y., 378 (People v. Gay),* the court of appeals affirmed and approved *People v. Hulse,* and overruled the contrary opinions of *Judge Cowen.*

The case of *Russell v. Coffin, 8 Pick., 143,* is an early case in Massachusetts, where the question was carefully considered, and decided against receiving the sustaining testimony. Other cases are referred to by *Judge Bronson* to the same effect. And in *Brown v. Mooers, 6 Gray R., 451, Mr. Greenleaf's* doctrine is emphatically repudiated as unfounded.

Looked at as a question of principle, it is not easy to see the propriety of permitting such proofs. It is, in effect, an attempt to impeach one witness by showing the good character of another whom he has contradicted. But, until impeached in some way, every witness has the legal presumption of good character, which would not be touched by another's character; and the rule is well settled that good reputation cannot be shown affirmatively before it is assailed by proofs. If proof can be received which will allow good character to stand as a counterpoise to positive facts in one case, it would be very unjust to shut it out at any time.

The impeaching witness should be allowed to confirm his oath by it, if the impeached witness may use it against the impeacher, and the process would never come to an end.

It is not collateral, but direct, when offered upon the issue raised by an impeachment of general reputation. There the witness on one side asserts, and the opposing witness denies the same facts, and no side issues are raised. But whatever may be the likelihood that a man of good character will tell the truth, it will not turn falsehood into truth if he asserts a falsehood; and the attempt to sustain contradicted witnesses by evidence of character can only lead to endless inquiries, which are not likely to aid in getting at the facts in issue. It is far less satisfactory than

the view and comparison of witnesses before the jury. It would require every witness (as well remarked by *Parker, C. J.*) to "bring his compurgators to support him when he is contradicted; and indeed it would be a trial of the witnesses, and not of the action."—*8 Pick., 154.*

We think the rule which excludes proof of character in such cases is sound and reasonable, and we are disposed to adhere to it.

A remaining question is of some consequence. Objection was made that the information was not properly framed to support the conviction.

The information is very brief, and consists of the single statement that respondent, on a day and year and at a place named, "one Mary A. Bowers feloniously, willfully and wickedly did kill and slay, contrary to the statute in such case made and provided, and against the peace and dignity of the state of Michigan."

It is not claimed by any one that this would have been a good indictment at common law, not only for formal defects, but also for not indicating in any way the means or manner of causing death. But it is justified under our statute, which dispenses with allegations of these, and declares it sufficient "to charge that the defendant did kill and slay the deceased."—*C. L.,* § *7916.*

Respondent claims that the constitutional right "to be informed of the nature of the accusation" involves some information concerning the case he is called on to meet, which is not given by such a general charge as is here made. And courts are certainly bound to see to it that no such right is destroyed or evaded, while they are equally bound to carry out all legislative provisions tending to simplify practice, so far as they do not destroy rights.

The discussions on this subject sometimes lose sight of the principle that the rules requiring information to be given of the nature of the accusation are made on the theory that an innocent man may be indicted, as well as a guilty one, and that an innocent man will not be able to

prepare for trial without knowing what he is to meet on trial. And the law not only presumes innocence, but it would be gross injustice unless it framed rules to protect the innocent.

The evils to be removed by the various acts concerning indictments consisted in redundant verbiage, and in minute charges which were not required to be proven as alleged. It was mainly, no doubt, to remove the necessity of averring what need not be proved as alleged; and therefore gave no information to the prisoner, that the forms were simplified. And these difficulties were chiefly confined to common-law offenses. Statutory offenses were always required to be set out with all the statutory elements.—*Koster v. People, 8 Mich. R., 431.* The statute designed to simplify indictments for statutory crimes, which is in force in this state, and is a part of the same act before quoted, reaches that result by declaring that an indictment describing an offense in the words of the statute creating it, shall be maintained after verdict.—*C. L.,* § *7928.* But both of these sections must be read in the light of the rest of the same statute, which plainly confines the omission of descriptive averments to cases where it will do no prejudice. And so it was held, in *Enders v. People, 20 Mich. R., 233,* that nothing could be omitted by virtue of this statute, which was essential to the description of an offense.

Manslaughter at common law very generally consisted of acts of violence, of such a nature that indictments for murder and manslaughter were interchangeable, by the omission or retention of the allegation of malice, and of the technical names of the offenses. In a vast majority of cases a very simple allegation would be enough for the protection of the prisoner.

But where the offense of manslaughter was involuntary homicide, and involved no assault, but arose out of some negligence or fault from which death was a consequential result, and sometimes not a speedy one, the ordinary forms were deficient, and the indictment had to be framed upon

the peculiar facts, and could convey no adequate information without this.—See *2 Bishop's Cr. Proced.*, § *538.*

The offense for which the respondent in this case was put on trial, originated in the statute defining it, and could not have come within any of the descriptions of manslaughter at common law. An innocent person, charged under the information, could form no idea whatever from it of the case likely to be set up against him. He might, perhaps, be fairly assumed bound to prepare himself to meet a charge of manslaughter by direct violence or assault. But which one was meant, out of the multitudinous forms of indirect and consequential homicide that might occur after a delay of any time not exceeding a year, from an original wrong or neglect, and of which he might or might not have been informed, he could not readily conjecture. Nothing could inform him of this statutory charge, except allegations conforming to the statute. These, we think, he was entitled to have spread out upon the accusation. Without them he was liable to be surprised at the trial, and could not be expected to prepare for it.

We are not prepared to hold this information bad upon its face, for we are disposed to think, and it was practically admitted on the argument, that it may apply to the ordinary homicides by assault. It was not, therefore, until the evidence came in, that it was made certain the case was different. The question of sufficiency does not arise directly upon the record, but on the bill of exceptions, and the error was in permitting a conviction on it.

The other questions are closely connected with this, and need not be considered further.

It must be certified to the court below that the verdict should be set aside, and that no further proceedings on this charge should be had under this information as it stands.

The other Justices concurred.