## GEORGE C. WORTHINGTON *vs.* THE STATE OF MARYLAND.

*Abortion—Indictment for Manslaughter for Causing Death by Abortion—Dying Declarations—Evidence.*

The crime of abortion is a misdemeanor only at common law, when there is no intent to kill the woman, and *Code*, Art. 27, sec. 3, which increases the punisment, still leaves the crime a misdemeanor. Consequently causing the death of a woman by means of an abortion, is manslaughter and not murder.

An indictment, not for the statutory offense of abortion, but charging the defendant with the crime of manslaughter, as the consequence of an abortion performed by him and resulting in the death of the woman, is valid.

Upon the trial of an indictment charging manslaughter resulting from an abortion produced by the defendant, evidence of the dying declarations of the woman is admissible, since the indictment is not for the statutory crime of abortion but for homicide.

A dying declaration is admissible in evidence when the declarant believed she would die, although the attending physician held out hopes of recovery.

A woman dying, in consequnce of an abortion performed upon her, made a dying declaration that "Dr. Worthington" had committed the abortion. *Held*, that the identification of the defendant as the "Dr. Worthington" referred to is a question for the jury.

When a person has declared his belief that he is about to die, declarations as to the cause of death made on a subsequent day, are admissible as dying declarations when the belief subsisted.

A witness testifying concerning dying declarations made to him is not obliged to repeat the exact words used by the declarant, but may give his recollection of the substance of the declaration.

A dying declaration made in response to questions put to the decedent is competent evidence.

Appeal from the Criminal Court of Baltimore (DENNIS J.). The indictment in this case was as follows :

State of Maryland, city of Baltimore, to-wit : The jurors of the State of Maryland, for the body of the city of Baltimore, do on their oath present that George C. Worthington, late of said city, on the eighteenth day of June, in the year of our Lord one thousand eight hundred and ninety-nine, with force

and arms, at the city aforesaid, in and upon one Amelia A. Miller, feloniously and willfully did make an assault, and did then and there feloniously and willfully force, thrust, and strike a certain instrument, to the jurors aforesaid unknown, which he, the said George C. Worthington, then and there had and held in his right hand, up and into the body and womb of the said Amelia A. Miller, who was then and there pregnant with child, and did then and there feloniously and willfully give and administer to the said Amelia A. Miller, so being pregnant with child as aforesaid, divers dangerous poisons, drugs, mixtures, preparations, medicine and noxious things, the more particular description of which is to the jurors aforesaid unknown, for the purpose then and there of causing, without legal justification, the miscarriage and abortion of the said Amelia A. Miller, thereby then and there inflicting on the said Amelia A. Miller in and about her womb and other internal parts, certain mortal bruises, wounds, lacerations, sickness and feebleness of body, of which said mortal bruises, wounds, lacerations, sickness and feebleness of body, she the said Amelia A. Miller afterwards, to wit, on the thirtieth day of June in the said year there died ;

And so the jurors aforesaid, upon their oath aforesaid, do say that he, the said George C. Worthington, her, the said Amelia A. Miller, in the manner and by means aforesaid, feloniously and willfully did kill and slay;

And that before the commission of the felony aforesaid, Henry G. Allgire, late of said city, on the said eighteenth day of June, in the said year, at the said city, did feloniously and willfully counsel, aid, incite and procure the said George C. Worthington to commit in manner and form aforesaid, the said felony contrary to the form of the Act of Assembly in such case made and provided, and against the peace, government and dignity of the State.          HENRY DUFFY,
                 State's Attorney for the City of Baltimore.
     The above indictment duly endorsed, " True Bill
                              E. H. WALKER,
                                 Asst. Foreman."

The case was argued before McSHERRY, C. J., FOWLER, BRISCOE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*Wm. Pinkney Whyte* for the appellant:

Murder and manslaughter are different crimes and not different degrees of the same offense ; and on an indictment for murder and a conviction of manslaughter, the verdict must negative the murder. *Weighorst* v. *State*, 7 Md. ·442.

If the death of the woman, produced by unlawful means, is to be the subject of the charge and the proof sustains it, the indictment should be for murder and nothing else. It is either murder in this State or nothing. That an abortion, which results in the death of the woman, is common law murder is beyond disputation. In some of the States statutes have either made it manslaughter, as in Wisconsin, Michigan, Indiana and Oregon, or an aggravated abortion, punishable less severely than murder. *Bishop on Statutory Crimes*, sec. 743.

It is a general principle, that if an action unlawful in itself be done deliberately and with intention of mischief or great bodily harm to particular individuals, or of mischief, indiscriminately, fall where it may, and death ensue against or beside the original intention of the party, it will be murder. Thus, where a person gave medicine to a woman to procure an abortion, and where a person put skewers into the womb of a woman for the same purpose, by which, in both cases, the women were killed, these acts were held clearly to be murder ; for, though the death of the woman was not intended, the acts were of a nature deliberate and malicious and necessarily attended with great danger to the persons on whom they were practiced. 1 *Hale's Pleas of the Crown*, 429; 1 *East's P. C.*, ch. v., sec. 17, page 230, sec. 124, page 354; 1 *Russell on Crimes*, 740; 4 *Black Comm.* 201. Is not this the very case described in the indictment under consideration ?

At the common law the unlawful use of instruments or drugs upon a pregnant woman, though with her consent, for the purpose of producing an abortion, if it resulted in her

death, was *murder;* while the statute of Wisconsin reduces the crime to manslaughter in the second degree. *State* v. *Dukinson*, 41 Wisc. 299. The death of a person on whom the crime of abortion has been committed, is not under the Pennsylvania statute a constituent element, in itself, of the offense ; but simply determines the character of the penalty. *Railing* v. *Comm.* 110 Pa. St. 103.

The charge was the wilfull procurement of an abortion without any necessity for it, whereby death was occasioned. If death unexpectedly results from such an act, the crime was at common law murder, and under the statute of Iowa murder in the second degree. The defendant was guilty of murder in the second degree, or of nothing, and hence it is impossible that a conviction for manslaughter can stand. *State* v. *Moore*, 25 Iowa, 137.

This indictment has no precedent in this State nor anywhere else where the common law prevails. Why was this done ? Was it to deprive the accused of the constitutional right of removal ? Under section 8, Article 4 of the Amended Constitution, the accused, under the indictment for murder, had the absolute right of removal to some other Court, having jurisdiction, for trial ; but under an indictment for manslaughter he could only remove it upon satisfying the Court that he could not have a fair and impartial trial, or that he had reasonable ground for his suggestion. His suggestion and affidavit for removal from a city of which he was not a resident, and where he believed there were prejudices against him, were promptly turned down. Such an indictment in like circumstances has had no prototype in this State, and it will be a crying reproach to criminal jurisprudence, if it shall stand, as a precedent.

The first bill of exception relates to the preliminary examination of the Court as to the condition of mind of the deceased at the time she was alleged to have made certain dying declarations. Dr. Conrad D. Strauss, who had been a witness for the State at the first trial of the case, sought to give in evidence certain alleged dying declarations, to which he

had not made the slightest reference in his former examination, and described her condition on the Wednesday following the Saturday on which he had been called to see her. First, on Saturday, nothing was said by the girl, beyond a brief description of her symptoms. He prescribed for her, and on Sunday, Monday, and Tuesday, she had greatly improved, her fever had abated and her pain decidedly less, then she was asked, whether or not she had had an abortion performed, to which no reply was made; then, on Wednesday following, Dr. Jones was called in and Dr. Strauss said, that she seemed to be rational and bright every time he saw her; every day he saw her—on the 24th, 25th, 26th, 27th, 28th, 29th, and on Friday, 30th, when she died. She said on Monday or Tuesday, that she was going to die, to please save her. "I told her that she should not worry and that she would probably get well."

When the doctor told her he would do all he could for her *she made no reply*, and yet in the same connection he said that she repeated she was dying. The following days and subsequent days, although she was better, and the doctor held out the hope of recovery, and actually told her she would get well, she did not say she was dying, but she said "she expected to die." * * To this preliminary examination and the evidence given upon it, the accused, by his counsel, objected on the ground that it was not such as to justify the giving in evidence of any dying declaration.

The principle on which such declarations are admissible is concisely stated by LORD CHIEF BARON EYRE thus: "That they are declarations made in extremity when the party is at *the point of death*, and *when every hope of this world is gone*, when every motive to falsehood is silenced, and the mind is induced by the most powerful considerations to speak the truth—a situation so solemn and so awful—is considered by the law as creating an obligation equal to that which is imposed by a positive oath in a court of justice." *R. v. Woodcock*, 1 Lea. 502; *R. v. Drummond, Id.* 338; 1 *Taylor on Ev.*, sec. 644; 1 *Greenleaf, Ev.*, sec. 156. " It is essential to

the admissibility of these declarations : 1. " That at the time when they were made the declarant should have been in *actual danger of death* ; that he should then have *a full apprehension of his danger* ; and lastly, that *death should have ensued.* All these facts, therefore, must be proved to the satisfaction of the judge before the evidence will be received." 1 *Taylor on Evidence*, sec. 648.

It will be borne in mind that the medical attendant assured her that she would recover, and all that she had said was that she expected to die. And Dr. Strauss testified that he was not worried at that time ; " I still had the favorable diagnosis." There was no actual danger of death on that Wednesday. It is the impression of *impending death*, not of a remote ending of life. If, therefore, she had *any* expectation or hope of recovery the declaration is inadmissible. 1 *Taylor on Evidence*, sec. 648. It is respectfully submitted that the foundation was not laid in accordance with the recognized rules of evidence to justify the introduction of dying declarations, and the ruling of the Court on the first exception should be reversed.

The second bill of exceptions relates to the admission of what was called a dying declaration, which was objected to by the accused, but which was permitted by the Court to go to the jury as a dying declaration. It is as follows : Q. Well, now, doctor, what was that conversation on Wednesday when Dr. Jones was present ? A. Well, in the presence of Dr. Jones she repeated and told Dr. Jones—then she said that Dr. Worthington had committed this abortion on her. Q. Did she say anything else in regard to it ? A. Well, I cannot just say. Q. Did she say what Dr. Worthington—A. No, sir. Q. That Dr. Worthington had committed this abortion on her ? A. Yes, sir.

This evidence was allowed to go to the jury as a dying declaration, although none of the circumstances were detailed nor the *identity* of the accused in any way established. Declarations made *in extremis* are admitted from the necessity of the case to *identify the prisoner* and the deceased to show the *res gestae*, and to show the transactions from which the death results.

*Wharton's Cr. Ev.*, sec. 278; *State* v. *Hamilton*, 27 La. Ann. 400; *State* v. *Shelton*, 2 Jones (N. C.) 300; *Johnson* v. *State*, 17 Ala. 618; *State* v. *Jefferson*, 77 Mo. 136, and 9 Bush. 11. This statement does not mount up to a dying declaration. Witnesses must state facts and not their conclusions. 1 *Green-leaf, Evidence*, sec. 159. A witness would be required to state what was said and done. Facts are thus to be stated. This rule should be applied with jealous care to dying declarations.

A dying declaration must relate to the *circumstances* attending the injury. *Only so much is consistent as details the manner of it.* When the declarations of the deceased state the unlawful act, name the time when and the party by whom it was done, then only they may be competent. Dying declarations must speak to *facts* only. *Roscoe Cr. Ev..* 32; *Wharton's Cr. Ev.*, secs. 294, 278; *Wilson* v. *Boem*, 15 John R. 201.

The rule is confined to a statement of the circumstances connected with the fatal act and forming part of the same transaction. A person dying from an unlawful act committed by another may detail the *circumstances* of the act, but *cannot describe his condition* after the act is *done.* " The highest office which can be rightfully allotted to a dying declaration is a statement of the transaction which occasioned death." Beyond this it cannot be extended without an invasion of settled and salutary principles. A narration to a physician, that on her journey something dropped from her, and she had been taking some stuff, etc., was not admitted either as a dying declaration or part of *res gestae*. *Hays* v. *State*, 40 Md. 651. See as to mistakes as to the identity of persons and to the omission of facts essentially important to the completeness and truth of the narrative. *Taylor*, sec. 652; *Jackson* v. *Kruffen*, 2 Johns, 35; *R.* v. *Ashtin*, 2 Lew C. C. 147; 2 *Poth Obl.* 255, (293;) 2 *Starkie, Ev.* 367; 1 *Ph. Ev.* 292; *Sussex Peerage*, 11 Cl. & Fin. 108.

The third bill of exceptions relates to the permission allowed Dr. Hampson Jones to state what was alleged to be a dying declaration made by her, not after she had de-

clared that she expected to die, but before she had given the slightest intimation that she had a full apprehension that she was in danger of actual impending death, and consequently made without the powerful consideration to speak the truth arising from the awful situation attendant upon immediate dissolution.    It is clearly a perversion of the rule of necessity which allows this departure from the strict course of legal proceedings.

The fourth bill of exceptions relates to the alleged dying declaration itself.    The State's attorney was allowed to ask the witness, Dr. Jones, who could not recollect the words of the declaration, what was the impression made on your mind as to what she said ?    This being an effort to get the opinion of the witness as to the declaration, and not the declaration itself, was the substitution of the witness' opinion in place of the judgments of the jury, and was certainly improper.    But the objection was overruled.    This ruling of the Criminal Court can hardly stand scrutiny.    Was this the security of a fair and impartial trial guaranteed to every citizen by the Constitution and the laws ?    A witness is not to give his impressions, but to state the facts from which he received them. *Evans* v. *People*, 12 Mich. 35.

The fifth bill of exception relates to the admission of a dying declaration based upon a statement of the deceased's condition of mind, without specifying whether the assertion as to her expecting to die was made before or after the declaration about to be offered in evidence.    It will be seen upon the rest of Dr. Jones' testimony, that the name of Dr. Worthington was put into the mouth of the deceased by some person in the room, who was not identified.

A mere expression of opinion that Dr. Worthington operated upon her, without identifying him, cannot be received as a dying declaration.    The indictment charges the use of drugs as well as an instrument, but up to this point not a particle of testimony as to the manner in which the abortion was alleged to have been produced had been given.

All the preceding alleged dying declarations were testified

to as taking place on Wednesday, but the mother was called to testify to a dying declaration made on Thursday, about 3 P. M. " There was a change, and everything really got excited." " I will never get out of this bed alive ! " *Rex* v. *Crockett*, 4 C. & P. 544; *Van Buscell*, 3 C. & P. 629; 2 *Russ. Cr.* 2; *Rex* v. *Shilsbury*, 7 C. & P. 187. This was the extent of the preliminary examination and objection being made to the permission to the witness to testify to such declarations, it was overruled, and the sixth bill of exception signed. Did this preliminary examination justify the admission of dying declaration ?

To all the previous bills of exception the attention of the Court has been drawn to the inadmissibility of the dying declarations upon indictment for homicide ; but in discussing the seventh and eighth bills of exception the objection against their admissibility is that the indictment is in reality an indictment for abortion under the statute.

The statute does not make the death of the woman an essential ingredient of the offense. The act alleged to have been perpetrated by the accused was a crime under the section of the article of the Code above referred to, in the absence of the death of the mother. Such death only increased the degree of the crime and the punishment to be inflicted. *People* v. *Davis*, 56 New York, 103. Upon an indictment for feloniously using certain instruments upon the person of a woman, who afterwards died, with intent to produce a miscarriage, the dying declaration of the women is inadmissible. *Rex* v. *Mead.*, 2 B. & C. 608, affirmed in *Regina* v. *Hind*, 8 Cox Cr. Cas. 300.

It has been often decided, that in prosecutions for producing an abortion dying declarations are not admissible. *Rex* v. *Lloyd*, 4 C. & P. 233; *Wilson* v. *Boorem*, 15 Johns, 286; *Reg.* v. *Hind*, 8 Cox C. C. 300; *Wooden* v. *Wilkins*, 39 Geo. 223; 2 *Russell on Crimes*, 762.

The general rule is that dying declarations are admissible only where the death of the declarant is the subject of the charge, and the *circumstances* of the death are the subject of

the dying declarations.   1 *Greenleaf, Ev.*, sec. 156; *Rex* v. *Lloyd*, 4 C. & P. 233; *Runyan* v. *Pine*, 15 St. 8; *State* v. *Harper*, 35 St. 78; *Wharton's Cr. Ev.*, sec. 288; *Roscoe, Cr. Ev.*, page 32; *Brims* v. *State*, 46 Ind. 311; *Dulany* v. *Johnson*, 32, Me. 55; 1 *Taylor on Ev.*, 644–6.

*Isidor Rayner, Attorney-General,* and *Robert M. McLane, State's Attorney for Baltimore City,* for the appellee :

1. The chief objection urged to the indictment in this case is, that while it purports to be an indictment for manslaughter, the crime charged and set forth (viz.: death by abortion) is murder.   This we understand to refer to murder in the second degree, since we know of no case or authority in which a homicide by abortion has ever been held to be more than murder in the second degree.   Now whether or not death brought about by a criminal abortion is murder or manslaughter, has never been decided in this State.   We maintain, however, that upon authority and reason it is merely manslaughter, for the following reasons : Murder in the second degree is where death results from the commission of a felony, or from the commission of an act likely to produce death.   Now at common law abortion is at most a misdemeanor, (*Clark, Crim. Law,* page 180; *Whar., Crim. Law,* 10th ed., sec. 592,) and it has been held in this State that our statute has made no change in the grade of this crime, which still remains a misdemeanor. *Lamb* v. *State,* 67 Md. 533.

It is also a well-known fact that death is not a usual and probable consequence of an abortion.   It follows, therefore, that in Maryland a killing by abortion is simply manslaughter, since it is the result of a misdemeanor and of an act not likely to produce death. *Whar., Crim. Law,* 10th ed., sections 316, 323, 325, 450. *Clark, Crim. Law,* 161, 174. *Yundt* v. *People,* 65 Ill. 373.   In those States where it has been held that death caused by a criminal abortion is murder, it will be found that either the statute expressly makes it murder, or the crime of abortion itself has been declared by statute to be a felony. *Clark, Crim. Law,* 161.

At the trial below appellant cited Lord Hale as authority
for holding homicide by means of an abortion to be murder,
but a careful reading of the chapter from which appellant's
citation is taken (1 *Hale Pleas of the Crown*, ch. 33,) shows
clearly that the learned author is not using the word " mur-
der" in its technical sense.   He is distinguishing between pun-
ishable and non-punishable killing, and laying down the dis-
tinction that where medicine is given to cure disease, whether
by a licensed or unlicensed physician, and death unexpectedly
results, the physician is not punishable, while, if given not to
cure a disease but to produce miscarriage, it is punishable.   It is
also evident that throughout the whole discussion he is not
clearly differentiating between the words "murder," "man-
slaughter" and "homicide."

The indictment properly therefore charges manslaughter,
and as a manslaughter indictment is free from legal objection.
The words " malice aforethought," necessary in all indictments
for murder, but improper in those for manslaughter, are pur-
posely omitted ; and the conclusion of the indictment does
not charge the traverser with having " murdered," but with
having " killed and slain."   For forms of indictment for man-
slaughter see *Bishop's New Criminal Procedure*, vol. 2, sec.
502; *Bishop's Directions and Forms*, sec. 528.

Moreover, even if death by abortion constituted murder (as
contended by appellant), the indictment in this case is suffi-
cient, since a prisoner guilty of murder may be indicted for
the lesser offense of manslaughter, which is included in mur-
der.   There can be no doubt that one indicted for murder may
be properly convicted of manslaughter, the lesser offense being
included in the greater.   (*Starkie, Crim. Pleading*, pages 41
and 343; *Whar., Crim. Law*, page 27; 6th Md. 167; 39th Md.
355; *Whar., Crim. Pleading and Practice*, section 246.)   It is
the common practice for the State at the trial to abandon the
highest grade of offense charged in the indictment, and ask
for a verdict on a lower grade contained in the same count.
If this can be done after the indictment is drawn, it can surely
be done in drawing the indictment, if the pleader considers

that on the State's evidence there should be no proper conviction of the higher grade of offense.

At the trial below appellant contended that the failure to indict him for murder deprived him of the right of removal. While this proposition is entirely irrelevant to the case upon the ground and for the reason that if the State had the right to indict for manslaughter, it was not the indictment which deprived him of the right of removal, but the failure of the law to give it to him ; still, the State thinks it proper to make the following suggestions relative to this proposition advanced by appellant at the trial below.   The absolute right of removal is given to a prisoner by the Maryland Constitution only in *capital* cases (*Const.*, Art. 4, sec. 8), and therefore as far as homicide is concerned, is available only where the prisoner is indicted for murder in the first degree.   Now, as stated above, the highest offense for which appellant, on his own contention, could possibly have been indicted, is murder in the second degree, which is not a capital offense, but one in which the right of removal is discretionary with the Court exactly as in the case of manslaughter.

. 2. The indictment is for homicide, and not for abortion under the statute.   In the first place, it does not follow or pretend to follow the words of the statute, which it would have to do if drawn thereunder, and the mere fact that the expression " without legal justification " (appearing in the indictment) expresses an idea somewhat similar to one contained in different words in a proviso of the statute cannot make it an indictment under a statute which it does not follow. This expression was inserted in order to negative a defense which would have been available even at common law under an indictment for homicide by abortion, viz., the necessity of saving the life of the mother at the expense of that of the child.   *Wharton, Cr. Law*, 10th ed., sec. 510, 595.

Moreover, if drawn under the statute it would not have set out the death at all, since the gist of the statutory offense is not death, which may or may not result, but the endeavor to produce a miscarriage.   On the other hand, the indictment

does contain all the essential averments of an indictment for manslaughter, since it distinctly charges a killing without malice aforethought, and only refers to an abortion by way of setting out the means whereby the killing was produced. *Bishop's New Crim. Law*, vol. 2, sec. 641.

The form on which this indictment is drawn is one given in *Bishop's Directions and Forms*, sec. 528, as the form of indictment for homicide of mother by abortion. Then, too, the fact that an accessory is charged in the conclusion of the indictment shows that it is one for the felony of manslaughter, and not for the misdemeanor of statutory abortion, since in misdemeanors all participants are principals, while accessories exist only in felonies. This then being an indictment for homicide, a dying declaration is admissible under it. *Roscoe, Crim. Ev.*, vol. 1, page 33 (star page), 8th ed.

3. We contend that the preliminary proof measures up to the strictest requirements of the law. In order to justify the admission of a dying declaration the evidence must show that at the time of the making of the statement offered to be proved the declarant was in actual danger of death, and had abandoned all hope of recovery. The mere fact that the doctor holds out hope of recovery does not exclude the declaration where declarant has abandoned all hope. *People v. Simpson*, 48 Mich. 474; *Regina v. Peel*, 2nd Foster & Finlason, 21.

Moreover, the proof of deceased's apprehension of death is not confined to his declaration, but the fact may be satisfactorily established by the circumstances of the case. *Roscoe, Crim. Ev.*, vol. 1, page 33; 24 Cal. 17; 2nd Gratt. 594; 16 Ala. 672; 74 Ala. 21. The question of consciousness of approaching death, though determined by the Court is one of fact, in deciding which all the circumstances of the particular case are to be considered. *Whar., Crim. Ev.*, 9th ed., secs. 282 and 297.

In this case Amelia A. Miller made three dying declarations: The first to Doctors Strauss and Jones, on Wednesday, two days before she died; the second to her mother, on Thursday afternoon, the day before she died; and the third to her

mother, father and sister, on Friday morning, the day of her death. Thus it appears that her death occurred very soon after the declarations. The evidence also shows that to every one of the witnesses to whom declarant talked from Monday until Friday (the day of her death), she expressed in various ways her conviction that she had no hope of recovery.

Pearce, J., delivered the opinion of the Court:

The defendant was indicted in the Criminal Court of Baltimore for manslaughter in causing the death of Amelia A. Miller through an abortion performed on her by him. He demurred to the indictment, and the demurrer being overruled he was convicted and was sentenced to the penitentiary for ten years. Nine bills of exception were taken to the admissibility of evidence, and the questions thus presented, together with the demurrer, are now before us for determination. As the demurrer raises a question of novelty and of some importance in criminal pleading and practice we shall request the Reporter to set out the indictment in full.

The appeal has been ably argued on both sides, and the experienced and distinguished counsel of the defendant addressed a very earnest appeal to us for the correction of the grave errors which he contends were made in the rulings upon the demurrer and upon the evidence, and we have responded in a careful and patient search for any error which would require or would justify a reversal of the judgment.

The proposition upon which the demurrer is based, is, that the death of a woman resulting from a criminal abortion upon her, is, at common law, murder, and the indictment, if it can at all be regarded as an indictment for homicide, is defective, because it charges death as the result of the abortion, but charges the defendant with the crime of manslaughter instead of murder. It is contended that this defect is obvious, from the fact that murder and manslaughter are different crimes and not different degrees of the same crime, and the further fact that there is no statute in this State reducing the character of the crime—when the death of the mother is caused by a criminal abortion—from murder to manslaughter.

The principal reliance for this contention is the case of *State* v. *Moore*, 25 Iowa, 137, in which the opinion of the Court was delivered by JUDGE DILLON. The defendant was indicted for murder in the second degree by abortion. The defendant demurred to the indictment on the ground that the offense charged was not murder, because it had been held in Iowa that no act, though indictable at common law, could be punished as a crime unless the act was declared criminal by statute, and it was argued that as the statute defining and punishing murder was passed in 1851, and the statute making the procuring of an abortion unlawful was not passed until 1858, that the latter act, which says nothing about murder, could not make that murder which was not so before. The same question was also raised by a request to the Court to instruct the jury that they might convict of manslaughter, which instruction was refused. The Court held, and as we think properly, that the Act of 1851 being unrepealed, continued to speak in 1858, and had the same force and effect as if it had been passed concurrently with, or subsequent to, to the Act of 1858, and therefore overruled the demurrer. But the question still remained whether, under that indictment, a conviction for manslaughter could be had. Upon that question, the Court cited the passage from LORD HALE, 1 P. C. 429, 430, relied on here, as follows: "If a woman be with child, and any gives her a potion to destroy the child within her, and she takes it, and it works so strongly that it kills her, this is murder ; for it was not to cure her of a disease, but unlawfully to destroy the child within her ; and therefore he that gives a potion to this end, must take the hazzard, and if it kills the mother it is murder." The Court also cited to the same effect *Commonwealth* v. *Parker*, 9 Metc. 263, *per* SHAW, C. J., and in disposing of the demurrer, said: "The crime we have seen was at common law murder, and under our statute is murder in the second degree. Under the charge, and under the evidence, the defendant was guilty of murder in the second degree or of nothing, and hence the Court did not err in refusing to say to the jury that they might convict the defen-

dant of manslaughter.'' Too great respect cannot be paid to the opinions of these eminent judges, but it is obvious that there must be some limitations to the doctrine thus alleged to be laid down by LORD HALE, and we are unwilling to adopt it as a hard and fast rule, even though fortified by JUDGE SHAW and JUDGE DILLON; and, as the State's Attorney has pointed out, a careful examination of the chapter from which the above citation was taken, will show that the word *murder* was not necessarily used in its technical sense, but as equivalent to homicide, embracing both murder and manslaughter.

But whatever may have been the severity of the earlier common law, the proposition is too broadly stated that death resulting from criminal abortion has always been murder at common law. The crime of abortion is a misdemeanor only at common law and our statute, while broadening the scope of the common law, and increasing the punishment, still leaves the crime a misdemeanor. For this reason, as stated in *Clark's Criminal Law*, p. 161, "causing the mother's death in attempting an abortion, is only manslaughter at common law, if the attempt is not made in a way that endangers the mother's life. In the latter case it is murder." It is only in jurisdictions where abortion is raised by statute to the grade of felony that causing the death of the mother is necessarily murder. *Idem.*, p. 191, 174. Mr. Wharton says in his Criminal Law, sec. 325, that where there is no intent to kill or to inflict grievous injury, and no likelihood of such result, the offense is but manslaughter; and in sec. 318 of his work on Homicide, he says, "whether the offense is murder or manslaughter depends largely on the intent as appearing on the whole case. If the intent was to kill or grievously injure her the offense is murder. It is manslaughter if the intent was only to produce the miscarriage, the agency not being one from which death or grievous injury would be likely to result."

It is common knowledge that death is not now the usual, nor indeed the always probable consequence of an abortion. The death of the mother doubtless more ·frequently resulted in the days of rude surgery, when the character and proper-

ties of powerful drugs were but little known, and the control over their application more limited. But in these days of advanced surgery and marvelous medical science and skill, operations are performed, and powerful drugs administered, by skillful and careful men without danger to the life of the patient. Indeed, it is this comparative immunity from danger to the woman which has doubtless led to the great increase of the crime to the establishment of a class of educated professional abortionists, and to the enactment of the severe statutes almost everywhere found to prevent and punish this offense. The woman takes her life in her hands when she submits to an abortion, be she wife or maid, but her death is no necessary element in the procuring of an abortion, and the application of the harsh rule here contended for would have no effect in the repression of that abhorrent crime, which can only be efficiently dealt with by severity in the enactment and administration of the law punishing the attempt upon the life of the unborn child.

In the late case of *Peoples* v. *Commonwealth*, 87 Ky. 492, the law upon this subject is well reviewed, and the doctrine announced in Clark and Wharton, as we have stated it, is approved and adopted. In *Regina* v. *Gaylor*, 7 Cox's Criminal Cases, 253, decided in 1857, the indictment was for manslaughter by abortion, and the prisoner was convicted. The evidence showed that the prisoner was clearly guilty of being accessory before the fact to the woman taking the drug with intent to procure an abortion, and the Judge reserved the case for the opinion of the Court of Criminal Appeal. It was heard before POLLOCK, C. B., BRAMWELL and WATSON, BB., and ERLE and WILLES JJ. ERLE, J., before whom the case was tried, said : "This would, in my opinion, be murder if she died in consequence of taking that drug. But the *grand jury* found that it was manslaughter. If a man is indicted for manslaughter, and it turns out to be murder, he may be found guilty of manslaughter. In this case I thought he was guilty of murder by administering the drug, and might therefore be convicted of manslaughter."

The Judges affirmed the conviction, but without giving their reasons for doing so.

If the present indictment had been for murder, as it is contended it should have been, there can be no doubt a conviction of manslaughter would have been good ; *State* v. *Flannigan*, 6 Md. 167; *State* v. *Davis*, 39 Md. 355; so that the defendant is in the singular position of complaining of an indictment because it does not subject him to conviction for a graver offense than that with which he is charged.    But Mr. Wharton says, in sec. 390 of his Criminal Law, "Where there is no intent either to take the life of the mother, or to do her grievous bodily injury, the proper course is to indict separately for the *manslaughter* of the mother and for the perpetration of the abortion."

Courts in this State constantly instruct grand juries that they ought not to indict, if, upon the evidence produced by the State, they would not convict if sitting as petit jurors, and for the same reason, if, upon the evidence of the State, they would not convict of the higher offense if sitting as petit jurors, they would be justified, with the advice of the State's attorney, in refusing to subject the accused to the danger of conviction upon a charge of which the accusing body would not, upon that evidence, convict him.    See *Yundt* v. *People*, 65 Ill. 372.

We can discover no defect in this indictment which a demurrer could reach, and we think there was no error in overruling it.

The defendant also contends that the indictment does not charge any form of homicide, but is for the statutory offense of abortion, and that for this reason no dying declaration can be received.    But this contention cannot be sustained.    It is certain that dying declarations can only be received where the death of the deceased is the subject of the charge and the circumstances of the death the subject of the declaration.    1 *Greenleaf's Ev.*, sec. 156; *Wharton's Crim. Ev.*, sec. 276.    But in prosecutions for abortion the death of the woman is no part of the facts which go to constitute the crime.    That is com-

plete, with the death or without it.   It is not a constituent element of the offense.   *Railing* v. *Commonwealth*, 110 Pa. St. 100.   A comparison of this indictment with our statute defining and punishing abortion, must make it evident that no competent pleader could have so framed an indictment under that statute.   It makes no pretence of conforming to the fundamental rule of safety—to follow the language of the statute. No inference to sustain the defendants contention can be drawn from the use of the words "without legal justification," because the defense that the act was necessary to save the life of the mother is equally a defense to an indictment for the murder or manslaughter of the mother, and to an indictment under the statute for an abortion.   1st *Wharton's Crim. Law*, sec. 595.   The *corpus delicti* of the offense of abortion is the destruction of the unborn infant, and the form given by Bishop—Directions and Forms, sec. 138—requires an averment that in consequence of the means used " the life of the said child was then and there destroyed and it was then and there prematurely born ;" no averment of this character is to be found in this indictment, which closely follows the form given by *Bishop*, *supra*, sec. 528, for general use where the *corpus delicti* is the death of the mother.   In *People* v. *Olmstead*, 30 Mich. 439, where the indictment was for manslaughter by abortion, the Court said:  " Manslaughter at common law very generally consisted of acts of violence of such a nature that indictments for murder and manslaughter were interchangeable by the omission or retention of the allegation of malice, and of the technical names of the offenses. The learned Judge before whom this case was tried, in the ruling which counsel reduced to writing and incorporated in the record, has stated the law as clearly as possible in these words :  " This is not an indictment for abortion.   It is an indictment which charges manslaughter, and the facts of the abortion are simply alleged there as going to show what caused the death, just as if it had been alleged that the means of death were by shooting her with a pistol."   There can, therefore, be no doubt that under such an indictment dying decla-

rations are receivable.  We now come to the exceptions to the testimony.

Evidence was admitted of three distinct dying declarations made by the deceased ; one to Dr. Strauss and to Dr. Jones on Wednesday, two days before she died ; one to her mother on Thursday afternoon, the day before she died, and one to her father, mother and sister on Friday, the day of her death. Defendant's counsel in his brief states that the objection to the admissibility of the evidence embraced in the seventh and eighth exceptions is that the indictment is in reality an indictment for abortion under the statute, so that these exceptions may be eliminated without consideration, in view of our determination that the indictment is not for abortion but for homicide.  We will add, however, that we have examined them and if deemed material, they would fall within the disposition to be made of the others.  The first exception is upon the ground that no proper foundation was laid to justify the admission of any dying declaration.  Dr. Conrad Strauss, her attending physician, was called in Saturday night.  He saw her once on Sunday and on Monday; twice on Tuesday ; twice or three times on Wednesday ; once on Thursday, and once on Friday, the day of her death.  He detected blood poisoning and suspected an abortion.  Until Wednesday he had favorable hope of the case, but she became worse that day, and he became alarmed, and called in Dr. Jones.  She constantly declared she expected to die, so repeating daily from Monday up to the time of her death, and begging him to save her as she was dying.  He held out hope of recovery but this did not change her belief, she continuing to declare she expected to die.  The principle on which dying declarations are received is too familiar to require statement, but it is essential that actual danger of death must exist—that there is full belief that it is actually impending—and that death ensues. Any expressed or clearly visible hope of recovery will render the declaration inadmissible.  But the declarant's own belief at the time is the criterion of admissibility.  1st *Greenleaf's Ev.*, sec. 158.  It is not material that others, even the physi-

cian, thought differently and held out hopes of recovery. *People* v. *Simpson*, 48 Mich. 474 (*per* Cooley, Campbell and Marston); *Regina* v. *Peel*, 2 Foster & Finlason, 21. The rule in such cases is stated in 2 *Taylor on Evidence*, sec. 718, as follows: "A firm belief that death is impending, by which is meant, not as once thought, a belief that it will follow almost immediately, but that it will certainly happen shortly in consequence of the injury sustained is sufficient to render the statement evidence, though the sufferer subsequently express a hope of recovery, or may chance to linger on for some days, or even two or three weeks." We think the testimony of Dr. Strauss measured up to the strictest requirements of the law, and that the Court did not err in permitting the State to ask for her declaration.

The proper foundation being laid, Dr. Strauss stated, after exception to the question—what statement she made—that on Wednesday, in the presence of Dr. Jones, she told him Dr. Worthington had committed this abortion on her, but that she did not say what Dr. Worthington—to all which defendant objected, and this constitutes the second exception. It is urged that this does not identify the accused, but this is for the jury. He was free to show that there were other doctors of that name in Baltimore, or to show any other fact which would destroy or impair the weight of her declaration as identifying him. The State produced another Dr. Worthington who swore that he never treated nor saw the deceased, and if there were still others, not discovered by the State, that fact would not be likely to escape the vigilance of the defendant and of his counsel. We think there was no error in this ruling.

The third exception arose in this way. Dr. Jones testified that on Wednesday she declared in his presence she expected to die, and also that she stated who had committed the abortion on her. Counsel for defendant then asked if this was before or after she had declared her expectation that she would die, and he replied that he could not recollect; and counsel objected to his answering the question unless he could first

say that it was after she had declared to him her expectation that she would die, but the Court overruled the objection and admitted the question.   In this there was no error.   It was only necessary that the declaration she expected to die should, *in fact,* precede the dying declaration.   Dr. Strauss had already fixed this declaration of belief as made before the dying declaration, both on that day and on the two preceding days. The belief was a continuing belief, as appears from all the circumstances of the case, and we can discover no error in the ruling.   This ruling disposes of the fifth exception, which is identical in principle with the third.

The fourth exception arose upon these questions to Dr. Jones—Question by Gov. Whyte.

"Tell us what she said about expecting to live ?

Ans.  She said she expected to die.

Ques.  Did she say so ?

Ans.  As far as I know.   I don't remember the *exact words,* but only give my impression.

We object unless the *words are given.*

Ques. by State's Attorney.  What was the impression made on your mind as to what she said ?"  To this question counsel for defense objected, but the Court overruled the objection and permitted the question to be asked.   It is manifest that the impression spoken of by Dr. Jones, and asked for by the State's attorney, is not an impression of the *subject* of the declaration, but of the *substance,* the form in which it was expressed ; that, in fact, it was rather the recollection than the impression of the witness which was sought, and which he intended to give. The law does not require that the very words be repeated.   *Wharton's Crim. Ev.,* 9th ed., sec. 461.   We therefore think this ruling correct.

The sixth exception relates to Dr. Jones' testimony also. He stated she said an abortion had been performed on her, but he could not recollect whether she said by whom. The Court then asked : "Was it stated in her presence by whom this operation was performed ?  Ans.  It was, sir. Ques.  Did she assent to that statement ?  Ans.  I believe she

did, sir.  Ques. Were you present when Dr. Worthington's name was mentioned? Ans. I was, sir.  Ques. Mentioned in what connection? Ans. In regard to this abortion.  Ques. Who mentioned it? Ans. I don't remember that, sir." The exception seems to be that Dr. Worthington's name was put into the mouth of the deceased.  But the declarations may be in response to leading questions, or even to urgent solicitation.  I *Greenleaf's Ev.*, sec. 159.  *Bishop's New Crim. Procedure*, sec. 1213.  The assent may be by a mere pressure of the hand, or otherwise.  *Bishop, supra; Commonwealth v. Casey*, 11 Cush. 417.  We can perceive no error in this ruling.

The ninth and last exception was taken to the testimony of the deceased's sister, Mrs. Papf, who was present just before she died, when she told the minister, who had come to pray with her, that she was dying in the arms of Jesus, and that Officer Allgire and Dr. Worthington were the cause of her trouble.  This exception was not argued before us and is not mentioned in the brief of the defendant, and it is difficult to imagine upon what ground it could be attacked, unless it be for want of identification of the accused, which we have already considered in disposing of the second exception.

Finding no error in any of the rulings of the Court, the judgment must be affirmed.

> *Judgment affirmed with costs above and
> below.*

(Decided January 16, 1901.)