PEOPLE *v.* ALEXANDER.

1. EVIDENCE—DYING DECLARATIONS—RES GESTÆ—HOMICIDE.
   Declarations of respondent's wife during the five days she survived after being shot, that her husband killed her, were competent so far as they related to the act of killing and the *res gestæ*.

2. SAME—THREATS—INTENT.
   Threats previously made by respondent to kill his wife, shown by declarations of the deceased made to her father, were inadmissible where the threats were general and did not relate to the actual killing or to any purposed act of the deceased.

3. SAME—HUSBAND AND WIFE—PREVIOUS ASSAULT.
   Dying declarations are not admissible to show matters not intimately connected with the homicide or mere conclusions or opinions not otherwise admissible.

4. SAME.

> Evidence that the wife while dying disclosed previous trouble with or assaults by her husband is not competent as a part of the dying declaration.

5. SAME—HEARSAY—DYING DECLARATIONS.

> Nor were the statements admissible to explain the wife's endearing language, claimed to have been addressed to the husband after the shooting and properly received in evidence on cross-examination of witnesses for the prosecution, for the purpose of showing the degree of culpability which she attached to his act.[1]

Error to Wayne; Mandell, J. Submitted April 22, 1910. (Docket No. 139.) Decided June 6, 1910.

John Alexander was convicted of manslaughter and sentenced to imprisonment for not less than seven nor more than fifteen years in the Detroit house of correction. Reversed.

*Edward H. Kennedy* and *Thomas J. Mahon*, for appellant.

*John E. Bird*, Attorney General, *Philip T. Van Zile*, Prosecuting Attorney, and *Fred H. Aldrich*, Assistant Prosecuting Attorney, for the people.

BLAIR, J. Respondent was convicted of manslaughter, upon an information charging him with murdering his wife by shooting her with a revolver. Respondent testified that while he was endeavoring to remove the cartridges from his revolver, when he was intoxicated, it was accidentally discharged. For proof of the charge in the information the people relied largely upon the dying declarations of the wife, made from time to time during the five days that she survived her wound. Portions of these statements were objected to by respondent's counsel, and the assignments of error covering the rulings of the court upon such objections present the principal questions for

[1] As to admissibility in evidence of dying declarations, see note to *Worthington* v. *State* (Md.), 56 L. R. A. 353.

our consideration.   We have no doubt that a sufficient foundation was laid for receiving the dying declarations so far as they concerned the shooting itself or embraced the *res gestæ* thereof.   But it is contended that certain declarations covered by the assignments of error were received which did not relate to the act of killing and were not confined to the circumstances attending the act as part of the *res gestæ*, but related to former and distinct transactions in no legal sense a part of the *res gestæ*, and which were, therefore, erroneously received in evidence.

The statement by Mrs. Alexander of the shooting, as narrated by her father, was as follows:

"Eva said—that is my daughter—'John come home drunk and abused me and my baby, and I asked John, where have you been, and he asked me, where have you been?'  Eva told him she had been over to the grocery store, and bought a dozen heads of cabbage and a crock, and telephoned to him for a sauerkraut cutter, and he said he would make one—he could make one better than they could buy, and she said he brought the sauerkraut cutter home, but she didn't see it, but he still abused her, and says, 'Who's been here?' and she says, 'No one has been here,' and he says, 'Yes, there has been some one here,' and she said, 'If you say so—if you say there has been some one here—it must have been so,' and she said she was afraid of him; that she dassn't contradict him; did not want to contradict him, and he said, 'There was some one here, and I will shoot you,' and she said, 'Don't shoot me, for my sake or my baby's sake,' or 'my sake or God's sake, don't shoot, John,' and he said, 'I will shoot you,' and she says, 'If you are going to shoot I will have to call in the neighbors; I will have to call for help,' and he said, 'If you call for help, I will shoot you,' and reached for the revolver that was under the pillow, and said, 'Look out, I will shoot,' and 'he shot and I got it,' and she says, she said, 'If I had stepped one step further to the left I would have been safe; if I had been one step further to the right baby would have got it.'

The father was further permitted, against objection, to give the following testimony:

"*Q.* What, if anything, did she state to you about other troubles preceding this?

"*A.* She never mentioned her troubles to us whatever, until after the shooting. Of course I spoke to her about the troubles once or twice through her sickness, but on account of her severe pain, etc., I did not bother her a great deal about it; but in her statement to us there, the day before she died, she placed her finger to her lip there, and lifted it up there and said, 'There is a mark he left me, and we had to take some stitches in that.'"

Other witnesses testified:

"*Q.* What, if anything, did she say during that time, after having made these remarks, as to the manner in which she was injured? (Objected to.)

"*The Court:* You may answer that.

"*A.* She said, 'My husband deliberately shot me.'

"*Mr. Kennedy:* I move that that be stricken out as an improper conclusion in any witness, and therefore not proper in this declaration.

"*The Court:* Is that what you say Mrs. Alexander said?

"*A.* Mrs. Alexander said, 'My husband deliberately shot me.' * * *

"*Q.* What further was said with reference to her relations with her husband?

"*A.* She said, 'Many times he has wronged me,' and many bullets she had dodged. * * * Well, she was suffering great pain, and she said, 'Just to think that my husband deliberately shot me.' * * *

"*Q.* What further?

"*A.* She said she had always been a good, true wife to him. * * *

"*Q.* Did she say anything about their relations prior to the shooting? (Objected to as incompetent and immaterial.)

"*A.* Not at that time.

"*Q.* Did she subsequent to that time?

"*A.* Yes, sir; she said he had abused her.

"*Mr. Kennedy:* I make the same objection.

"*The Court:* That was at a different conversation.

"*Mr. Aldrich:* Yes, but later. * * *

"*A.* When she was suffering intense pain, she said, 'And just think, he shot me. It is not the first time; many times he has threatened me, and many bullets I have dodged.'"

This court held in *People* v. *Beverly*, 108 Mich. 509 (66 N. W. 379), that threats obviously and intimately connected with the homicide were admissible in evidence as dying declarations, as throwing light upon the cause of the shooting. In that case the threats were specific that if his wife should leave him or refuse to cohabit with him he would shoot her, and it appeared that when the precise contingency arose in the event of which he threatened to shoot her he did shoot her. In the present case the anterior threats were general, and, according to her declarations, were accompanied by many attempts to shoot her, which she was fortunate enough to dodge. So far as her declarations go, no intimate and obvious connection existed between the previous threats and the shooting in question here, and the aggravated assault and battery requiring stitches to be taken in her lip was apparently in no wise connected with the homicide. While the narrative may include all of the circumstances attending the criminal act, including threats obviously connected with it, and the declarant may state any of such circumstances which she might have stated if she had survived, the universal rule, as established by the courts, is that such declarations may not include narrative of matters not immediately connected with the fatal occurrence, and may not state mere opinions or conclusions where such opinions or conclusions would not be admissible from the lips of a living witness. 10 Am. & Eng. Enc. Law (2d Ed.), p. 382 *et seq.;* 21 Cyc. p. 975; *People* v. *Olmstead*, 30 Mich. 431; note to *Worthington* v. *State*, 56 L. R. A. 353 (92 Md. 222, 48 Atl. 355); note to *State* v. *Meyer*, 86 Am. St. Rep. 637 (65 N. J. Law, 237, 47 Atl. 486).

The statements as to previous trouble were not admissible in evidence, and should have been rejected. In view of respondent's claim that the shooting was entirely accidental, it cannot be said that the errors were without prejudice. Neither, in our opinion, does the record justify the argument that the declarations in question were admissible in opposition to, or in explanation of, the expres-

sions of affection by Mrs. Alexander for her husband called out on cross-examination by respondent's counsel.

The first witness called by the prosecution was the physician who attended Mrs. Alexander immediately after she was shot. He testified on his direct examination:

"She told me she was shot. She said my husband shot me, when she was placed on the couch in answer to my question. Nothing further was said in that regard."

On cross-examination he testified, among other things, as follows:

"Then Mr. Alexander came in shortly, and I heard her say to him, 'My dear husband,' in affectionate terms. During the entire time there she constantly used endearing terms toward her husband. I heard her say: 'Come to me, my dear husband.' And from the conversation had there the two of them appeared to be affectionate to each other. * * * After I returned I heard him use further endearing terms to her and she to him. He was at that time rendering what assistance he could. * * * She asked God to bless her and take care of baby and her husband. * * * He wanted me to be sure and do right. He was then very affectionate toward her and concerned, and she was the same toward him."

The next witness called by the prosecution was Mrs. Alexander's father, who testified as hereinbefore stated. We think the testimony of the physician upon cross-examination was competent, as showing the attitude of the wife towards the husband soon after the shooting and as having some bearing upon the degree of culpability which she attached to his act. *Hurd* v. *People*, 25 Mich. 405. Other witnesses for the prosecution testified to the same effect, and, in fact, the testimony was undisputed. So far as the record discloses, her endearing remarks to her husband were not parts of a conversation qualifying them in any way or given in immediate connection with any of the declarations put in evidence. We do not think that the cross-examination in this regard justified the introduction of hearsay testimony as to previous troubles. The

public necessity which admits hearsay testimony in cases of homicide covers only the *res gestœ* of the fatal occurrence.

We do not deem it necessary to discuss the other assignments of error, since the alleged errors upon which they are founded will probably not arise upon another trial.

The judgment is reversed, and a new trial ordered.

OSTRANDER, HOOKER, MOORE, and BLAIR, JJ., concurred.