[Crim. No. 3551.  In Bank.—December 30, 1932.]

THE PEOPLE, Respondent, v. JACK D. GREEN et al., Appellants.

P. E. Keeler, R. Lee Bagby and Samuel Rummel for Appellants.

U. S. Webb, Attorney-General, and James S. Howie, Deputy Attorney-General, for Respondent.

SEAWELL, J.—The indictment upon which the defendants Jack D. Green and John Francis Regan were jointly tried and convicted in the Superior Court of the State of California, in and for the County of Los Angeles, was in two counts, the first count charged both jointly with having wilfully and feloniously murdered, on or about January 11, 1932, in said county of Los Angeles, Hugh A. Crowley, a police officer of the city of Los Angeles. The second count charged said defendants with a different offense of the same class of crime and connected in its commission with said murder charge, to wit, the crime of burglary. The homicide was committed by said defendants while engaged in a conspiracy to compel by force and fear the manager of the Fox Westwood Village theater, situate in an outlying district of the city of Los Angeles, in which they were lying in wait, upon his arrival at said theater, to open the safe of said theater, which contained about $600, which they had conspired to steal. This is an admitted fact in the case.

Separate verdicts were returned by the jury against each of the defendants. On the first count, which charged murder, the verdict of the jury was murder in the first degree, and with the express determination of the jury "that, as punishment therefor", the defendant, naming him, "shall suffer death". On the second count each was separately found guilty of burglary of the first degree.

Judgment was pronounced upon each separate count. Upon the first count the death penalty was pronounced against each defendant, and upon the second count each defendant was sentenced to imprisonment in the state prison,

as provided by law. From the order denying motions for a new trial, and from said judgments this appeal is taken.

As above stated, the participation of the defendants in the crime which resulted in the homicide was related by the defendants in their attempt to extenuate the punishment, as shown by the testimony of defendant Green given at the coroner's inquest to determine the cause of the death of Officer Crowley, by extrajudicial statements, and by corroborating facts. The evidence in this respect is conclusive.

The record does not satisfactorily disclose the background of the defendants. Their story was that they were strangers to each other until brought together the day before the homicide in Regan's room, at 1609 North Normandie Avenue, by Tom Conway, a reputed designing and cunning criminal, who, it was claimed by defendants, had occasionally served the authorities as a stool-pigeon, and upon some sort of reciprocity plan enjoyed certain police protection. ██ Both defendants bring Conway into the conspiracy as being the person who planned, encouraged and assisted in the commission of the crime. They claim that Conway furnished Regan with the pistol from which the shots were fired which killed Officer Crowley, and that he drove them in his car to the scene of the crime, where he was afterward to pick them up. What Conway's part in the crime was rests entirely upon the statements of the defendants, although it appears beyond doubt that Conway worked for a bail bond company and it was there that he became acquainted with defendant Green. He also had an acquaintance with Regan. Conway was taken into custody immediately after the murder and held in detention for a period, but was subsequently released, and although damaging statements were made and incriminatory testimony was given against him by both defendants, he did not appear to refute the same at the trial. However, his participation, if it be a fact that he did participate in the planning of the crime, cannot mitigate the wilfulness of the criminal purpose of the defendants.

To the time that Paul Barry, assistant manager at the Fox Rosemary Theater at Ocean Park, with Bud Brewer, a film distributor of Venice, entered the theater on a matter of business and thereupon summoned the janitor to unlock the manager's room, whereupon they were surprised by the presence of the defendants, who stood before them with

drawn arms and compelled them to submit to being bound, hand and foot, the evidence comes entirely from the defendants. From that point forward it comes from independent sources.

According to the story related by the defendants they left Regan's room at about 1 o'clock A. M., January 11th, which was Sunday morning, and were driven near to the scene of the crime by Conway. Upon alighting, they made sure all lights in the theater were extinguished. Green had reconnoitered the theater before. They entered the front door of the theater with the aid of a master key, which Green had made some months before. He was by trade a locksmith, and upon solicitation had been given the job of making a master key for the theater doors. His excuse for having the key was that it was not a perfect key and he threw it aside. Upon mentioning it to Conway some time before, the latter took possession of it and gave it back to him for the purpose of committing the burglary. After entering the lobby or foyer, the door leading to the manager's private room was unlocked by Green with the aid of the master key, and from there a closet which contained the safe was entered. In this room a tin money box was kept. It was broken open and $32 which it contained were appropriated and divided between the defendants.

The defendants knew that the manager arrived some time between 9 and 10 o'clock A. M., and their purpose was to await his arrival and force him to open the safe. The three men above named were bound by wire used in hanging pictures, which was furnished by Green. Obedience to the orders of the defendants was enforced by the menace of the revolvers held in their hands. Barry, who for a time was mistaken for the manager of the theater, was the last to be bound and compelled to lie side by side on the floor with his companions. He had been on the floor but a few minutes when the click of the lock attracted the attention of the defendants. Both prepared themselves for the entrance of the expected manager. When the door opened it proved to be Officer Crowley, dressed in citizens' clothes, who carried a key to the doors of the theater. He had entered through the front door. Upon suddenly being confronted by the armed burglars, he stepped back and started hurriedly for the front door. He was commanded to halt, and after some

hesitation he did so. Both defendants had hurried to his side, and each laid hands upon him and started to usher him into the room where the other men lay bound. The three men upon the floor said they heard no word spoken, but immediately two or three shots were fired in rapid succession, followed by an interval, and then two or three more shots were fired. The story of the defendants was that after Officer Crowley had consented to go with them to the room occupied by the other men, and after he had taken several steps, he suddenly swerved and broke away, assumed a stooped or crouched position, drew his revolver and shot first at Green, barely missing his face, and then at Regan, the bullet hitting him in the lower chest and passing out at the back, a few inches from the spinal cord. This shot, so Regan testified, knocked him backward several feet, and he explained that he surrendered, but when Crowley uttered an oath and expressed his intention of killing them both, he then shot at Crowley, with the result that Crowley was instantly killed. Green claims that he fired no shot, and in the excitement he dropped to the floor, and was unable to see clearly, by reason of the smoke caused by the pistol fire. He also claimed that when he left the room Crowley was still in a stooping position, and Regan, who was actually wounded, had preceded him in flight. Three bullets, apparently all from Regan's pistol, struck Crowley. One creased his arm, making a flesh wound, another entered the abdomen, and the third penetrated several vital organs, including the heart. Death was instantaneous. Both defendants fled through the rear exit of the theater to the street. On the way out, Regan dropped his pistol, which held three empty shells, and two loaded cartridges. The handkerchief and muffler used as masks by the defendants were recovered in their course of flight. The rubber glove finger tips worn by Regan to balk finger-print detection, Regan's cap, and other articles of apparel carried by them for the purpose of enabling them to disguise their appearance, were found en route of their flight. Green wore gloves. Regan's wound slowed him up quite a bit, and Green assisted him from the theater to a place about a block away, where he discovered a parked automobile, with the keys left in the lock. He helped Regan into the machine, and just as he was about to start the car the lady who owned it appeared and protested

his right to use the car. He told her that the man in the car, who was Regan, was badly hurt, and that he was taking him to a hospital and he would return the car. On the way to Regan's apartment the car gave considerable trouble and it was abandoned and a taxi commandeered to take Regan to his room. On the journey Green cached his loaded pistol and cartridge clip in an oleander tree, where they were afterward found. He explained to the taxi man and to the garage man at the apartment house where Regan lived that Regan, who was unable to handle himself without assistance, was intoxicated. Green took Regan to his room, destroyed his bloodstained clothing, called a physician and a friend of Regan, both of whom responded to the call, and left for his own apartment. On the following day he was arrested. He first denied any participation in the crime, but as the proofs began to overwhelm him he admitted that Officer Crowley was killed in the perpetration of the burglary and planned robbery, as herein related.

Green, in his first statements incriminating himself, did not name Tom Conway as the third party whom he later claimed was the person who planned the crime, but named a person whom he called Bill, as the *particeps criminis*. Both he and Regan latterly laid the blame of the crime upon Conway, whom they claimed brought them together. This issue was before the jury upon their statements and it was within the province of the jury to have relieved them of the extreme penalty of the law if the jury believed their statement and felt that it was a sufficient cause to mitigate their punishment. It may be said, however, that the preparation of the crime and the precautions taken by them against detection and the plan of its execution very strongly indicate that neither of the defendants was without criminal experience. Their main purpose was balked only by an unexpected or fortuitous circumstance.

Regan's room was visited by the officers on the same day that Green was arrested, but he had fled. In all probability he had been transported by airplane to San Francisco, where he was arrested two weeks later. He had then substantially recovered from all ill effects of the gun shot.

Regan admittedly fired the shot that took the life of Officer Crowley. Green, who was admittedly his confederate, indeed a principal in the commission of the burglary

(sec. 31, Pen. Code), is brought squarely within the provisions of section 189 of the Penal Code, which expressly provides that all murder which is committed in the perpetration or attempt to perpetrate robbery or burglary is murder of the first degree. The effect of this section has been so often and uniformly declared by this court that no doubt as to its meaning can longer reasonably exist. However, the court in this case instructed the jury meticulously and fully as to the right of the defendants to resist a deadly assault made upon them in the circumstances claimed by the defendants to have existed at the time the homicide was committed in the following most favorable instructions:

"If you believe from the evidence beyond a reasonable doubt that Regan with defendant Jack Green entered upon the premises of the Fox Village theater in Westwood for the purpose of committing a robbery, and while the defendant Regan was in the act of committing a robbery the deceased, interfered and shot defendant Regan, whereupon the defendant Regan offered in good faith to surrender, and in good faith gave himself up to the officer, it then became the duty of such officer to have accepted such surrender and not to wilfully and unnecessarily attempt to shoot thereafter.

"It is not every criminal act of a defendant which cuts off his right of self-defense. The right may in the first instance be cut off; and later by an act or offer on his part in good faith to surrender or give himself up, the right of self-defense may be restored to him.

"If an officer or other person, who attempts to prevent another from committing a felony wilfully uses more force than is apparently reasonably necessary, he becomes a wrongdoer and the person so sought to be prevented may resist said wilful excess of force by force, even to the killing of the officer so seeking to prevent the felony, if necessary, to preserve his own life from such wilfully excessive use of force, or to save himself from great bodily harm."

Again: "If you believe from the evidence in this case that defendant Regan entered upon the premises of the Fox Village theater in Westwood for the purpose of committing a robbery and while on said premises the deceased officer shot and wounded the defendant Regan, whereupon said Regan surrendered and informed the deceased of this fact, and in good faith endeavored to decline any further struggle

before the fatal shot was fired, and that the deceased declined to allow him to give up or surrender, but continued willfully and unnecessarily to fire at him, and that the circumstances were sufficient to excite the fears of the defendant as a reasonable man that his life was in danger and that he became terrified and in a state of excitement he shot and killed the deceased, then under such circumstances the defendants would not be guilty of murder.''

█ Objection was sustained to the proffered testimony of two of the character witnesses produced by appellant Green. Said witnesses had known Green in Denver, Colorado, during the year 1926. Their testimony was weak at the best and the court ruled it out on the ground that the time was too remote. The trial court has a wide discretion in the admission of this class of evidence, and it cannot be said that it abused its discretion in this particular instance. Character evidence is admissible under all the authorities to rebut the testimony of an incriminatory character tending to establish the truth of the charge. In the instant case the truth of the charge was admitted by the testimony of said appellant. The only question raised in his behalf is the application of the law to his situation. Appellant expressly admitted that the homicide was committed in the perpetration of a burglary in which he was an active participant. The reason of the rule in such circumstances disappears from the case. Besides, four or five witnesses gave testimony, weak it is true, as to the good character of said appellant. Besides, the court fully and fairly instructed the jury as to the importance and effect of such evidence as bearing upon the question of the guilt or innocence of the person charged. He suffered no prejudice from the court's ruling.

█ Appellants insist that inasmuch as they were convicted on two counts, one of which is murder with death penalty imposed and the other burglary, with a prison sentence attaching, both are invalid as each is antagonistic to the other, and neither is enforceable. There is no merit whatsoever in this contention. The enforcement of the judgment under count one will leave no one upon whom the judgment under count two could operate. The greater would, so to speak, swallow up the lesser.

We have read the entire transcript of testimony in this case, and examined the instructions. The record is excep-

tionally free from error. The trial court was liberal in its rulings, and commendably fair and clear in its charge.

We find nothing that would warrant this court in disturbing the verdicts of the jury or the judgments of the trial court.

The judgments and orders must, therefore, be and they are affirmed.

Shenk, J., Tyler, J., *pro tem.*, Waste, C. J., Langdon, J., Curtis, J., and Preston, J., concurred.

Rehearing denied.