STATE OF MONTANA, Plaintiff and Respondent, v. LAWRENCE R. MORRAN, Defendant and Appellant.

No. 9672.

Submitted June 18, 1956.   Decided January 4, 1957.

Rehearing Denied February 14, 1957.

306 Pac. (2d) 679.

Mr. Jess L. Angstman, Havre, Mr. John W. Bonner, Helena, Messrs. Harrison and Granat, Malta, for appellant.

Mr. Arnold H. Olsen, Atty. Gen., Mr. William F. Crowley, Asst. Atty. Gen., Mr. Willis M. McKeon, County Atty., Malta, Mr. Harry L. Burns, Chinook, for respondent.

Mr. Angstman, Mr. Bonner and Mr. Crowley argued orally.

MR. CHIEF JUSTICE ADAIR:

On July 6, 1955, an information accusing Lawrence Morran of the murder of Mervin Bishop was filed in the district court of Phillips County, Montana. Upon his trial, Morran, by a jury's verdict, was convicted of murder in the first degree and sentenced to life imprisonment.

This is an appeal by Morran from the judgment of conviction and the order denying him a new trial.

Carter Oil Company owned the building and land constituting a service station known as the Hi-Line Servicenter at Malta, Montana, which it leased to Clifford Lundstrom to operate.

About August 26, 1954, Lundstrom, the lessee operator, sold his stock in trade and his service station equipment to the appel-

lant, Lawrence R. Morran, also known as "Buster" Morran, for a cash consideration of $4,983.73. About $2,000 of the consideration was for Lundstrom's equipment and the balance for his stock in trade.

At the time of his purchase of Lundstrom's stock and equipment, Morran entered into a one-year lease agreement with the Carter Oil Company whereby he agreed to pay it a rental on the service station of $150 per month.

The appellant operated the Hi-Line Servicenter under such lease from August 26, 1954, until June 20, 1955, on which date the service station was consumed by fire.

At the beginning of the operation, appellant's business was fairly good but during the fall and winter months it declined considerably so that by June, 1955, the appellant was faced with various adverse financial problems. In round figures the total of appellant's obligations to various creditors was then in the neighborhood of $10,000.

To make the cash down payment to Lundstrom the appellant Morran borrowed $4,500 from the First State Bank of Malta on a promissory note secured by two co-signers and it was agreed at the time of making the loan that Morran should pay $300 per month on the note but at the time of the fire only three payments totaling $800 in the aggregate had been made on the note, leaving a balance owing to the bank of $3,700.

Robert J. Erhard, district manager of Carter Oil Company, spent June 2, 3 and 4, 1955, in Malta, during which time he discussed with Morran a plan whereby Mr. Hardin, the distributor in Malta for the Carter Oil Company products, could be paid for gasoline that he had delivered to Morran at his service station that had not been paid for and also the possibility of Mr. Morran selling his interest in the service station.

The record, in part, of Mr. Erhard's testimony at appellant's trial is as follows:

"Q. Did you discuss the question with Mr. Morran relative to a price? A. I told him to make up an inventory, take an

inventory of everything that he had and then we would start looking for a new dealer.

"Q. Was there ever a discussion relative to the cancellation of Mr. Morran's lease? A. At that time?

"Q. Yes. A. Yes.

"Q. What matters were discussed relative to that subject? A. Well, prior to the time that Mr. Morran leased the service station I told him that the rent would increase at the end of the first year. He and I discussed the fact that the rent was going to increase in August when his lease was up. He said that he couldn't afford to pay that much rent and wouldn't pay that much rent, so I told him that that would automatically cancel his lease.

"Q. What was the expiration date of Mr. Morran's first year's lease? A. I believe it's on the 25th of August.

"Q. That's 1955? A. Yes.

"Q. What was Mr. Morran's status with Carter Oil Company relative to paying his monthly rental? A. Well, he had missed paying it on schedule twice as I remember, once I believe in the spring. I wrote him about it, then I believe the May check for his rent did not go through the bank, did not clear the bank. * * *

"Q. What do the records indicate concerning the business at the Hi-Line Servicenter while it was operated by Mr. Morran? A. It slipped from previous business that we had done at the station.

"Q. Did you or did you not receive information that Mr. Morran was asking a price between eight and nine thousand dollars for his interest in the station? A. Yes, I did.

"Q. Did you have any conversation with Mr. Morran relative to this subject? A. Yes.

"Q. What was your conversation? A. I asked him where he arrived at the figure some place between eight and nine thousand dollars. He told me that included his accounts receivable."

From August 26, 1954, when Morran commenced operating

the service station, to the month of June 1955, the appellant had no fire insurance on either the station, the equipment therein, or the stock in trade. However, shortly before the fire, Morran through a local insurance agent, obtained fire insurance in the amount of $12,000 on the stock in trade and equipment in the Hi-Line Servicenter. This policy of insurance went into effect on June 11, 1955, but there is conflict in the testimony as to whether or not the appellant was aware that his stock and equipment were covered by insurance at the time of the fire for the policy was not delivered until two or three days thereafter, at which time the premium was paid in full.

On June 19, 1955, business at the station was as usual and the local distributor of Carter Oil Company's products called at the station to determine the sufficiency of the supply of stock on hand. At that time the appellant and his bookkeeper were at the station and placed an order with the distributor for a quantity of gasoline to be delivered. the next day. This order was placed after the distributor had been told that there would be funds available to make immediate payment for gasoline when delivered.

Also on June 19, 1955, the accounts receivable were brought to the station by the bookkeeper for another employee to examine but later that day the bookkeeper took the books home at the insistence of the appellant, who stated that he did not want them left at the station.

At about 1:00 a.m. on June 20, 1955, the appellant and one of his employees, Lloyd Knudsen, closed the station for the balance of the night but before doing so they counted out the change that would be necesssary to commence business when the station should next be opened for business and placed such change in a coin bag along with the credit slips which had been received during the day. The bag with its contents was then placed in a tire in the service room of the station by the employee Knudsen. The charge slips for gasoline sold on credit during that day were left in the dispensing machine located in the station.

The appellant testified that upon leaving the station he and Knudsen first went to a downtown restaurant for a cup of coffee; that upon leaving the restaurant the appellant stopped by the home of his bookkeeper and there left the money that was to be deposited the following day.

The bookkeeper testified that it was approximately 1:50 o'clock on the morning of June 20, 1955, when the appellant arrived at her home, at which time the appellant delivered to her the bag which contained not only cash to be deposited in the bank but also the credit card slips, the charge slips representing the accounts receivable, a small yellow carbon copy of a bill and two adding machine tapes.

The fire which consumed the Hi-Line Servicenter broke out at about 2:45 o'clock on the morning of June 20, 1955. According to the testimony of an investigator for the National Board of Fire Underwriters, the fire was caused by a small accumulation of gasoline on the floor and was of apparent incendiary origin.

In support of such conclusion the investigator stated that "the entire interior of the building appeared to have caught on fire at approximately the same moment and the fact that from no accidental or normal cause could I account for the apparent presence of an accelerant within the building that would cause that fire to spread and in effect explode as it did."

The explosion caused the large overhead door to the service room to buckle and fall outside upon the pavement. All the glass except one window in the rear of the storeroom was blown out of the building, some particles being found as far away as fifty feet from the building. Although the glass was blown out of every window, only one window was found to be unlocked after the fire.

At the trial there was considerable testimony directed as to whether this one window was open before the fire or whether the force of the explosion caused the lock to break and the window to be blown open.

Immediately following the explosion the burning figure of a

man was seen fleeing from the service station. He ran into the street directly in front of the service station and, with his clothing smoldering, collapsed near a highway designation sign, where he was picked up by witnesses who identified him as Mervin Bishop and who immediately rushed him to the local hospital where medical aid was summoned.

A second man, Donald Freestone, who was commonly known and called by the nicknames ''Turkey'' and ''Turk'', escaped the burning service station and fled to his home. There, in a badly burned condition, he was discovered by a younger brother who summoned another member of the family, who in turn took the injured man to the hospital.

The condition of these two men, shortly after the fire, is best described by the testimony of Dr. Robert M. Wiprud, a physician and surgeon, who testified:

''Q. As a result of that call did you go to the hospital? A. Yes, I did. I went immediately to the hospital.

''Q. What did you find there? A. When I entered the emergency room of the hospital I found a very severely burned patient on the table in the emergency room. The individual was totally unclothed. A great proportion of his body was charred, absolutely black, so much so that I didn't recognize him although I knew this individual.

''Q. You later found out who the individual was? A. Yes, I did.

''Q. Who was that individual? A. The individual on the emergency room table was Mervin Bishop.

''Q. What was the extent of his injuries? A. Mervin, I calculated his burns to be approximately eighty-five per cent of his body.

''Q. What degree of burns, Doctor? A. Mostly third degree burns, as severe as they could possibly be.

''Q. Did another patient come to your attention that same morning? A. Yes, approximately ten or fifteen minutes later they informed me that another patient was walking into the

hospital, and I advised the nurse to put him immediately into the major surgery room.

"Q. Was the identity of that patient brought to your attention? A. Yes, the patient himself told me that he was Donald Freestone.

"Q. What was his condition, Doctor? A. He was even more badly burned than was the previous patient. He was virtually a hundred per cent third degree burns.

"Q. Did you and Dr. Molloy administer medical attention to both Freestone and Bishop during this period of hospitalization? A. Yes, we did.

"Q. Where is Mervin Bishop now? A. Mervin Bishop, of course, died from his severe injuries.

"Q. In your opinion, Doctor, from your education, your experience and from the personal knowledge of this case, what was the cause of Mervin Bishop's death? A. Extensive third degree burns caused his death.

"Q. Doctor, where is Donald Freestone? A. Donald Freestone, of course, is likewise dead from severe third degree burns."

Donald Freestone first told his brother that he and Mervin Bishop went to the service station to get some gas as Bishop had a key and that when Bishop turned on the lights there was an explosion. However, a few minutes later, Donald Freestone told his brother that the two were "hired to blow it". Donald Freestone lived but about twelve hours after receiving his burns.

The shoes of both Mervin Bishop and Donald Freestone were introduced in evidence and the undersheriff, who had examined the shoes shortly after the fire, testified that the shoes of both men smelled of gasoline.

Mervin Bishop lived until Thursday afternoon, June 23, 1955.

Within a few hours after the fire a Catholic priest was summoned to the hospital and the last rites of the church were administered to both Mervin Bishop and Donald Freestone. The priest before administering the last rites to Mervin Bishop, received his confession. The testimony of the priest given at appellant's trial indicated that Mervin Bishop was able to respond

intelligently to the priest's statements and that the injured man seemed to understand the solemnity of the ceremony being performed.

On Tuesday evening, June 21, 1955, Dr. Daniel T. Molloy, a physician and surgeon, then attending Mervin Bishop, called at the hospital between 7:00 and 7:30 o'clock and had a conversation with Bishop concerning which Dr. Molloy testified as follows:

"Mervin Bishop asked me what was the condition of Turk Freestone. I informed him that Turk Freestone died shortly after they were admitted to the hospital, and he said, 'Am I burned as badly as Turk?' I said, 'Not quite, but just about as bad, Merv.' He said, 'Am I going to live, Doc?' I said, 'No, Merv, you are not'."

Later that evening Dr. Molloy returned to Bishop's room accompanied by Dr. Wiprud, the county attorney, and a friend of Bishop's named Clinton Dennis. Concerning this second visit with his patient, Dr. Molloy was examined and testified as follows:

"Q. I presume that this second meeting was pursuant to the understanding that you had with Mervin Bishop in which he asked for an hour or so to thing it over? A. Well, Mervin Bishop at first was not aware of my presence. Clinton Dennis had talked to the County Attorney and told him that he thought he could get Mervin Bishop to tell him, so I went in with Clinton Dennis while he questioned Mervin Bishop so that I could be present to watch out for the welfare of my patient.

"Q. You heard the conversation? A. I heard the conversation.

"Q. And you heard the statement that Mervin Bishop made? A. I heard the statement at that time. Mervin Bishop made the statement that he didn't want to talk about it until a later time and to please leave him alone. We went out of the room to the next room where Willis McKeon [the county attorney] told Mr. Dennis to ask him if Buster had anything to do with the fire. We returned to the room and Dennis put that question

to him again. Mervin Bishop was not aware of my presence and he said something like 'if you don't leave me alone, Clint, I am going to have a nervous breakdown'. And Mr. Dennis said, 'I just want to know, Merv, did he or did he not?' And Merv said, 'I don't know; I don't know.' I spoke up and I said, 'If there is anything you want to say, anything you want to get off your mind, Merv, go ahead and say it.' He said, 'Do you think I should talk?' I said, 'Yes', and he made his statement.''

Dr. Molloy's testimony laid the foundation for the admission of the dying declaration of Mervin Bishop, which was given orally within the hearing of the previously mentioned persons then present in the hospital room.

On Monday evening, June 20, 1955, Mervin Bishop said to Dr. Molloy, ''I am going to die.'' Bishop also made a statement to his friend, Clinton Dennis, which was overheard by Dr. Molloy to the effect that he (Bishop, a former boxer) was ''going down for the long count.''

On Tuesday evening, June 22, 1955, in a hospital room at the Malta Hospital, Bishop made the following dying declaration to which Dr. Molloy testified as follows:

''He stated that two weeks previous to the fire Lawrence R., 'Buster', Morran went to the Freestone residence north of town and propositioned Donald Freestone about setting the Hi-Line Servicenter on fire. At that time he said the arrangements were not definite but he wanted to know if 'Turk' Freestone would co-operate. Turk said he would, and Buster told him that he would get in touch with him at a later date.

''In the meantime Turk Freestone contacted Mervin Bishop and told him that Buster had a proposition to put to him about burning down the gas station. He said that when Buster called him about the proposition for the second time he would like Mervin Bishop to be present without Buster knowing it.

''We asked Mervin Bishop why he thought Turk Freestone did this and he said because Turk was chicken and was never one to do anything alone.

"So on Sunday, June 19, I think, he called Turk Freestone to the Hi-Line Servicenter. Turk Freestone then contacted Mervin Bishop and Mervin Bishop sneaked into the back room and into the men's rest room. Buster Morran then came to the back room with his proposition to Turk Freestone. He stated that he would give him fifty to five hundred dollars, depending on how good a job he did on burning down the Hi-Line Servicenter. He laid the plans for them that he would open the northwest window of the Hi-Line Servicenter and on some time Monday morning he was to enter the Servicenter and spread gasoline which Buster Morran would leave in the gas station around the floor and around the building and set fire to the building. Buster Morran was also, before he left the service station, to have poured gasoline around the place and Turk was just to finish the job, throwing it into the back room of the service station and then light it.

"So about 2:30, 2:00 to 2:30 in the morning Turk Freestone entered the northwest window of the Hi-Line Servicenter and Mervin Bishop stood jiggers while Turk Freestone entered. Mervin Bishop then followed Turk Freestone through the window. Then instead of setting about their business as they were supposed to, Turk went to the back room to obtain two tires for his car. After he obtained the tires for his car, Mervin was standing jiggers at the front door to make sure no one came.

"Turk threw a 15-gallon drum of gasoline into the back room as he was instructed, toward the water heater. At this point Mervin Bishop interjected that Buster was supposed to have turned off the flame, the pilot light in the water heater, but he did not, and 'I think he left it on on purpose to catch Turkey and destroy all the evidence.'

"He then stated that after the gasoline exploded he saw Turk Freestone thrown clear of the building or blown through the building and he, himself, was on fire and he left through the front door, the main door of the Hi-Line Servicenter, through the big doors. * * *"

There was also evidence showing that bills for the accounts

receivable of the Hi-Line Servicenter were mailed from Havre, Montana, to witnesses owing accounts at the service station, a few days after the fire, the bills covering transactions for the month up to and including the 19th of June.

Testifying in his own behalf, the appellant stated that Bishop had at one time worked for him and had a key to the door of the service station; that both Bishop and Freestone were indebted to appellant and that he had refused to extend further credit for the purchase of tires, although appellant did extend credit for the purchase of gasoline.

The appellant claims a money bag was left in a tire when the station was closed for the night. Although a careful search was conducted for both the bag and evidence of its contents in the form of melted coin neither could be found.

The appellant submitted a proof of loss to the fire insurance company for loss of stock and equipment valued at $11,636.58. This proof of loss was introduced in evidence at the trial where it was shown that the amount claimed for loss of stock could not be substantiated.

An accountant, who helped prepare an inventory during the month of May, 1955, testified that at that time there were only fifteen cases of oil on hand. There was also evidence the appellant purchased only eighteen cases of oil from the Carter distributor during the month of June 1955 and one of the appellant's employees testified that on the day before the fire the supply of oil was so low there was danger of running out. Notwithstanding, the proof of loss represented a loss of seventy-four cases of oil.

The loss of sixty new tires, thirty used tires, and one hundred inner tubes was also claimed, but there was testimony to the effect that on the day preceding the fire, appellant's stock of tires and tubes was so low that there were only between nine and twelve new tires, twelve to sixteen used tires and eleven to fourteen tubes in the station. A search of the ruins and debris after the fire produced only eight tire beads, being the

metal rings encased in the rubber of a tire where the tire is gripped by the wheel rim.

R.C.M. 1947, section 94-2503, in part, provides: "All murder ▮ * * * which is committed in the perpetration or attempt to perpetrate arson * * * is murder of the first degree; * * *."

R.C.M. 1947, section 94-204 defines a principal as: "All persons concerned in the commission of a crime, whether it be a felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission, * * *."

Under the above sections of the codes it is manifest that upon the introduction of proper substantial evidence to link the appellant with the perpetration of arson in connection with the burning of the service station, the state makes a *prima facie* case for the application of the felony-murder rule. However the appellant asserts that such rule has no application to the facts of the instant case which appellant contends are practically identical with those which obtained in People v. Ferlin, 203 Cal. 587, 265 Pac. 230, wherein the California Court, in arriving at its decision, relied heavily on the case of People v. Garippo, 292 Ill. 293, 127 N.E. 75. We are unable to agree with the contention so made. Illinois is a common-law state and the Garippo case, supra, is inapplicable under Montana's governing statutes. The facts in the Ferlin case, supra, are clearly distinguishable from those which obtain in the case at bar. See People v. Cabaltero, 31 Cal. App. (2d) 52, 87 Pac. (2d) 364; People v. Henderson, 34 Cal. (2d) 340, 209 Pac. (2d) 785; People v. Milton, 145 Cal. 169, 78 Pac. 549; People v. Boss, 210 Cal. 245, 290 Pac. 881; People v. Reid, 193 Cal. 491, 225 Pac. 859; People v. Green, 217 Cal. 176, 17 Pac. (2d) 730; 13 Cal. Jur., Homicide, section 17, page 600; 25 Cal. Jur. (2d) Homicide, sections 84, 85, pages 590, 592.

Appellant cites the civil case of Taylor v. John Hancock Mutual Life Ins. Co. 9 Ill. App. (2d) 330, 132 N.E. (2d) 579.

There the decedent lost his life when he entered a burning house, the fire resulting from arson in which the decedent was on of the conspirators. Thereafter in a civil suit by the administrator of the decedent's estate, the administrator was allowed to recover under a policy of insurance for accidental death but the doctrines applicable to such civil suit are not those which must govern in this action, brought and prosecuted as it is under specific sections of the Penal Code of Montana. For these reasons it is plain to see that the Taylor case, supra, is not even influencing, much less controlling here.

The appellant contends that a proper foundation for the admission of the dying declaration was not made because it was not clearly shown that the deceased made the statement while he was "under a sense of impending death." R.C.M. 1947, section 93-401-27, subd. 4. In support of such contention the appellant directs our attention to certain statements made at the hospital by Mervin Bishop such as he would have a "nervous breakdown", or "I will tell it all when I get well." However it is to be remembered that all such statements were made by Mervin Bishop to Clinton Dennis as Dennis was trying to obtain a statement from Bishop which Bishop was more than reluctant to give to his friend Dennis, but which matters Bishop apparently was willing to discuss with his physician, Dr. Molloy, and on which the patient Bishop sought his doctor's opinion and advice as to whether or not he should make a statement.

The procedure adopted by the trial judge in hearing and determining the sufficiency of the foundation laid for the admission of the dying declaration was that set forth in State v. Kacar, 74 Mont. 269, 279, 240 Pac. 365. It was within the discretion of the trial judge as to whether or not the jury should be present when the foundation for the admission of the dying declaration was being laid. Should the trial judge find the foundation sufficient and decide to admit the dying declaration in the absence of the jury, then the whole procedure is repeated for and in the record in the presence of the jury.

R.C.M. 1947, section 93-401-27, subd. 4, sets forth the con-

ditions under which a dying declaration will be admissable by providing that in criminal actions evidence may be given upon a trial of "the act or declaration of a dying person, made under a sense of impending death, respecting the cause of his death."

The matter of dying declarations has been before this court on various occasions.

In State v. Russell, 13 Mont. 164, 168, 32 Pac. 854, 856, after considering numerous authorities therein cited, the court said:

"These authorities all hold that if all the facts and circumstances surrounding the declarant at the time of making the declarations show them to have been made under the sense of impending death, notwithstanding declarant may not have said he was without hope of recovery, or was dying, or going to die, then such declarations are admissible in evidence." Also see State v. Gay, 18 Mont. 51, 44 Pac. 411; State v. Byrd, 41 Mont. 585, 111 Pac. 407; and State v. Kacar, supra.

In State v. Crean, 43 Mont. 47, 57, 114 Pac. 603, 606, Ann. Cas. 1912 C, 424, the court said:

"It is not necessary to the introduction of a dying declaration that it be shown that the declarant was *in extremis* by evidence independently of the declaration itself. * * * In fact, it was formerly assumed that any evidence of the condition of the deceased, other than his own statement, was inadmissible; but the rule now is well settled that the party offering the evidence may avail himself of any means by which the declarant's condition can be shown; and if the evidence, whether given by the declarant or others, shows that the declaration was made under a sense of impending death, the object has been attained."

In State v. Martin, 76 Mont. 565, 569, 248 Pac. 176, 177, in reviewing the conditions precedent to admitting a dying declaration, the court said:

"* * * It will be observed that the rule requires, as a condition precedent to the admissibility of the declaration, preliminary proof of the concurrence of the following conditions: (1) That the declaration was made *by a dying person*, or, in the

more flowery phrases of the courts, by one *in extremis* or *in articulo mortis;* (2) that the declaration was made under a sense of impending death; (3) that the declaration relates to the cause of the declarant's death, or, more exactly, to the cause of his dying condition.''

The supreme court in the Martin case, supra, further discussed the problems relative to determination of whether the statement was made under a sense of impending death and affirmed the holding of the earlier Montana cases to the effect that the state of the declarant's mind may be shown by the circumstances surrounding the injury that would indicate a sense of approaching death, and, 76 Mont. at page 571, 248 Pac. at page 177, the court said:

''Among the circumstances tending to prove that state of mind are: That the declarant sought the consolation of religion, or received the last rites of his church, and whether his conduct was that of a person fully conscious of immediate approaching death, as evidenced by his directions for his funeral, the disposition of his property, the care of his family, and the like. Indeed, we may go further and adopt the extreme view of the textwriters and some courts, that: 'If in a given case the nature of the wound is such that the declarant must have realized his situation, our object is sufficiently attained.' 3 Wigmore on Evidence, section 1442.''

It is our conclusion that a proper foundation for the admission of a dying declaration of Bishop was laid. We reach this conclusion because of the statements of Bishop that he was ''going to die'' and that he was ''going down for the long count''; because he was told by his doctors that he was going to die of his burns; because he knew and appreciated that his doctor was telling him the truth and that he was about to die; because he received the last rites of his church; and he knew ''Turk'' Freestone had died of his burns and that his own burns were nearly as bad and because the very nature of his burns made death a certainty. As was said in State v. Russell, 13 Mont. 164, at page 169, 32 Pac. 854, at page 856, ''The facts

and circumstances surrounding the declarant in this case at the time of the making of the declaration warrant the conclusion that they were made under a sense of impending death, and, we think, were properly admitted as evidence to the jury.''

Appellant contends that certain portions of Mervin Bishop's ▮▮ dying declaration were hearsay, conclusions, or opinion evidence to which the declarant could not properly testify and that it was error to admit same. However the record fails to show that appellant's counsel made either timely, specific or proper objection to the specific parts of the declaration here complained of, either prior to or at the time of its admission. In the absence of timely, specific and proper objections the appellant may not wait until his appeal and then successfully predicate error on his following motion to strike the dying declaration, viz.: ''We move to strike this evidence upon the grounds and for the reason that it is hearsay evidence. It is plainly shown that it wasn't given in anticipation of death. It is incompetent, irrelevant, and immaterial as a dying declaration.'' Upon the making of such motion the trial court inquired, ''That's your objection for the record?'' to which appellant's counsel answered ''Yes.''

Appellant's above motion to strike was directed against the ▮▮ entire declaration and it failed to specify the objectionable parts. It is elementary that to be good the motion must point out the specific parts of the statement which are objectionable, and give the reason why such parts are objectionable. See Jackson v. State of Mississippi, 173 Miss. 776, 163 So. 381, 100 A.L.R. 789; Burgess v. State of Maryland, 161 Md. 162, 155 A. 153, 75 A.L.R. 1471; Williams v. Graff, 194 Md. 516, 71 A. (2d) 450, 23 A.L.R. (2d) 106; Southern P. R. Co. v. San Francisco Sav. Union, 146 Cal. 290, 79 Pac. 961, 70 L.R.A. 221, 106 Am. St. Rep. 36; Harris v. State 23 Wyo. 487, 153 Pac. 881; Viss v. Calligan, 91 Wash. 673, 158 Pac. 1012; 3 Am. Jur., Appeal and Error, section 345, page 91; 53 Am. Jur., Trial, section 147, page 132; 53 Am. Jur., Trial, section 151, page 137.

While it is the settled rule in Montana that objectionable

portions of a dying declaration may be stricken, see State v. Byrd, supra; State v. Crean, supra, yet in State v. Souhrada, 122 Mont. 377, 385, 204 Pac. (2d) 792, 796, in discussing the sufficiency of an objection to the introduction of evidence this court said:

"\* \* \* The error urged on appeal was not contained in the objection made to the particular question asked. It is well settled that an objection, to be good, must point out the specific ground of the objection, and that, if it did not do so, no error is made in overruling it. In other words, a party is confined to the specific objections made by him and can have the benefit of no others."

Appellant assigns as error the giving over his objection of the trial court's Instruction No. 8, which reads:

"Instruction No. 8.

"You are instructed that when two or more persons agree and confederate together to commit a crime under such circumstances as may, when tested by human experience, specifically result in the taking of human life, either in the execution or resistance of their unlawful plans, then each party to such common understanding or conspiracy will be held responsible for the consequences which might be reasonably expected to flow and which do flow from carrying into effect their unlawful combination, and for the taking of human life, if any, to accomplish the object of such conspiracy, even though such consequences were not specifically intended as a part of the original plan. The law is that, if two or more persons conspire to commit a felony and death happens in the prosecution of the common object, all are alike guilty of the homicide. The act of one of them done in the furtherance of the original design, in contemplation of law, is the act of all. And if such conspiracy and agreement is to do or perform an unlawful act constituting a felony, and in the prosecution of such unlawful act constituting a felony an individual is killed or death ensues, such killing is murder in the first degree.

"If you believe, from the evidence in this case, beyond a

reasonable doubt and to a moral certainty, that the defendant entered into a conspiracy or common design with another person or persons, to commit the crime of arson and that as a result thereof the crime of arson was committed and if in carrying out such crime Mervin Bishop was killed, then such killing was murder in the first degree and the defendant would be guilty thereof, though he was not present and did not actually assent to the killing of the said Mervin Bishop.''

Appellant's one and only objection to the above instruction ▇ was that it ''doesn't correctly state the law.'' In our opinion the instruction does correctly state the law insofar as concerns the instant case because of the provisions of R.C.M. 1947, section 94-2503, and we find no merit in the assignment.

Appellant specifies as error the trial court's refusal to give ▇ appellant's requested Instruction No. 32, which reads:

''Where a conspirator commits an act which is neither in furtherance of the object of the conspiracy nor the natural and probable consequence of an attempt to attain that object, he alone is responsible for and is bound by that act, and no responsibility therefor attaches to any of his confederates.''

We find no merit in the specification. The offered instruction incorrectly states the law to be applied under the evidence in this case in that the instruction presumes the presence of an intervening cause that would break the chain of events whereas here there was evidence of an unbroken chain of events leading from the conspiracy of the appellant and Freestone to the death of Freestone and Bishop in the perpetration of the arson. See Vol. 1, Warren on Homicide, page 326; Romero v. State, 101 Neb. 650, 164 N.W. 554, L.R.A. 1918 B, 70; 13 Cal. Jur., Homicide, section 17, pages 600, 603.

Appellant also specifies as error the refusal of the trial court ▇ to instruct the jury on the theory that an accidental death during the commission of a felony does not come within the felony-murder rule, R.C.M. 1947, section 94-2503, but it is clear from our earlier discussion of the applicability of such rule to the facts disclosed by the evidence in this case that any death

directly attributable to a plot to commit arson makes all the conspirators in the arson plot equally guilty of first degree murder. It was not error to refuse to give the proposed instruction.

Appellant further specifies as error the trial court's refusal to give two instructions based on the California case of People v. Ferlin, supra. As before stated, we are of the opinion that the Ferlin case, supra, is not applicable to the facts here involved as disclosed by the evidence herein and we hold that the trial judge was correct in refusing the proposed instructions.

We do not find any abuse of discretion in denying appellant's motion for a new trial, nor do we find any prejudicial error in the record before us on this appeal. Accordingly the order denying appellant a new trial and the judgment of conviction are affirmed.

MR. JUSTICE BOTTOMLY: concurs.

MR. JUSTICE ANDERSON: dissents.

MR. JUSTICE DAVIS: (specially concurring).

I concur in the affirmance of the judgment of conviction below and the order of the district court which denied the appellant (hereafter defendant) a new trial. I reach that conclusion however by a different route than that which the chief justice takes in his opinion.

More specifically, I agree at the outset that upon this record the dying declaration made by the decedent Bishop was properly admitted over the only objection which counsel for the defendant interposed at the trial, and accordingly was competent evidence for the jury to consider. I concur here to the point that the district court cannot now be put in error for. not sustaining an objection to this evidence which counsel did not choose to make when the evidence was offered.

With this dying declaration properly before the trial court the evidence then for the state in my view is clearly sufficient to take any issues of fact in the record to the jury. Here I

shall not elaborate upon the statement of the facts found in the opinion written by the chief justice. I shall content myself generally with the comment that the evidence including Bishop's dying declaration, as I read it, raises issues of fact for the jury to resolve. Its verdict that the defendant is guilty of murder in the first degree is supported by substantial evidence, which the jury believed. The weight of that evidence is not against that verdict such that on that ground we should grant a new trial. Compare State v. Schoenborn, 55 Mont. 517, 520, 179, Pac. 294.

Therefore on this appeal we may not set that verdict aside, or reverse the order of the trial judge who approved that verdict by denying a new trial, unless there was error in law in sending the case to the jury, as the lower court did, upon the theory that they might find the defendant guilty of murder in the first degree, although not present, because he advised and encouraged, i. e., counseled and procured, the burning of his service station by ''Turk'' Freestone under such circumstances as to make out the crime of arson, and that in the perpetration of that crime the decedent Bishop was killed.

Again more specifically, the controlling inquiry here is whether the trial court correctly invoked and applied R.C.M. 1947, section 94-2503, to the facts of this case both in his rulings made throughout the course of the trial and as well upon instructions offered or given. I think he did.

First, I have no doubt there is substantial evidence in this record that Morran, although not present when his service station was burned, nevertheless, counseled or procured the burning of that building by ''Turk'' Freestone under such circumstances that the crime of arson in the second degree as defined by our statute, viz., R.C.M. 1947, section 94-503, was perpetrated. The circumstantial evidence before us aside from the dying declaration made by Bishop points directly to Morran as a principal in the commission of that crime. Standing alone that evidence is sufficient, I believe, to send the case to the jury upon the issue of the defendant's guilt *vel non* of arson.

But I need not rest upon my answer to this subordinate inquiry.

For the circumstances which weigh so heavily against Morran are supplemented and corroborated by the dying declaration which Bishop made, and which I have already said in my opinion was properly before the jury. Particularly in that declaration Bishop tells of overhearing Morran and Freestone on Sunday afternoon, June 19, 1955, when they were in the service station, plan the fire which Freestone was to set early the next morning. Despite the denials by the defendant that he had any connection with this plot, the jury upon the evidence before them resolved this issue against him. On the record before me then I may not overturn that finding.

In short, all the evidence, including Bishop's dying statement, is clearly sufficient to show the defendant guilty of arson in the second degree as a principal in setting the fire which destroyed his service station on June 20, 1955. The one controlling question then which remains to be answered is this: Is the death of Bishop as the direct result of the burns which he received in that fire a homicide within the meaning of section 94-2503 of our Codes, which was committed in the perpetration of the arson of which on this record the defendant Morran stands rightly convicted? I think so.

There is no doubt again upon the evidence in the record wholly apart from Bishop's dying declaration that he died as the result of burns received by him in the fire which destroyed Morran's service station. Translated that evidence read with Bishop's account of that fire makes it clear to me the jury was justified in finding that Bishop was killed in the perpetration of the arson which the defendant counseled and procured Freestone to commit. For the details of the cause of his death are furnished by Bishop in his dying statement.

There Bishop says he ''went to the front of the station where he was again to stand jiggers in case someone came.'' Then he continues, after Freestone returned from the garage where he went to get two tires, he (Freestone) ''stood and threw gasoline into the back room in the direction of the water heater,

as directed." This reference is to the directions which Bishop said he overheard Morran give Freestone when he (Bishop) was eavesdropping at the service station in the afternoon before. Finally he says here, "As Turk [Freestone] threw the gasoline on the fire there was a loud explosion."

Again translated this evidence means that Freestone set the fire by throwing gasoline into the back room of the station where it exploded. In that fire Bishop was burned so badly that he died. For me we have here a case of a murder committed in the perpetration of an arson within the meaning of section 94-2503, which is clearly made out. If the jury believed the evidence, which the state's case put before them as their verdict indicates they did, they could rationally come to no other conclusion than that the decedent Bishop was murdered in the perpetration by Freestone of the arson which the defendant Morran had counseled and procured Freestone to commit, and that Bishop's death was a natural and probable consequence of the perpetration of that crime. Here it makes no difference that Bishop without the knowledge of Morran was an accomplice and not an innocent bystander. Freestone killed Bishop while burning Morran's service station. This is enough on the facts of this case. Compare People v. Cabaltero, 31 Cal. App. (2d) 52, 56, 59, 87 Pac. (2d) 364.

For authority to sustain me at this point I need not go beyond the decisions in this court. See State v. Bolton, 65 Mont. 74, 212 Pac. 504. But I note in support of my view particularly People v. Michalow, 229 N.Y. 325, 128 N.E. 228; Commonwealth v. Devereaux, 256 Mass. 387, 152 N.E. 380; Warren on Homicide (per. ed.), Vol. 1, section 74, pages 326, 327. Consequently I think there is no need to turn to the California case of People v. Ferlin, 203 Cal. 587, 265 Pac. 230, and similar decisions. This line of authority is inapplicable to the facts which the record on this appeal brings here. I therefore express no opinion whether in another case I would adhere to the rule which they announce.

MR. JUSTICE ANDERSON: I dissent.

MR. JUSTICE ANGSTMAN: (dissenting).

If we assume that the so-called dying declaration was admissible as such there were parts of it that were clearly inadmissible. To illustrate: Dr. Molloy was permitted to testify that Bishop, as a part of his declaration, stated that Morran was supposed to have turned off the pilot light in the water heater but that he did not, and "I think he left it on on purpose to catch Turk and destroy all the evidence." It is elementary and hornbook law that dying declarations may not include opinions or conclusions where such opinions or conclusions would not be admissible from the lips of the living witness. People v. Alexander, 161 Mich. 645, 126 N.W. 837, and authorities therein cited.

Other statements equally as incompetent were admitted as a part of the declaration. But it is held in the majority opinion that there was not sufficiently specific objection to the evidence. With this I do not agree.

As was proper the court excused the jury to hear evidence laying the foundation for the statement and asked the state to present the statement. When it came to offering the statement defendant's counsel made the following objection:

"We will object to it because it is not shown yet the boy knew he was going to die. I mean he had more sense, probably, than the fellows that were trying to get this statement because he wanted them to get out of there or he would have a nervous breakdown. He wasn't thinking about dying; he was thinking about living."

The statement was then given in the absence of the jury after which defendant made the following motion to strike:

"We move to strike this evidence upon the grounds and for the reason that it is hearsay evidence. It is plainly shown that it wasn't given in anticipation of death. It is incompetent, irrelevant and immaterial as a dying declaration."

Defendant was allowed a continuing objection as the evi-

dence was repeated before the jury. The objection that the statement was incompetent was all the objection that was necessary. The greater includes the less. An objection that the statement as a whole was incompetent was an objection to each and every part of the statement.

We come then to the question what should be the ruling of the court when evidence is offered, a part of which is competent and admissible (if we assume some parts of the statement were admissible as a dying declaration) and a part of which is incompetent and inadmissible. The rule is that it is not incumbent upon the trial court to separate the admissible from the inadmissible. Rather, the duty to make this separation rests upon the party offering the evidence. The court, when the evidence is offered in one package containing some good and some bad if unwilling to separate the good from the bad, should reject the whole. Such is the ruling of the courts throughout the country. Wigmore on Evidence, 3d Ed., Vol 1, section 17, page 320, states the rule as follows: "If *several facts* are included in the offer, some admissible and others inadmissible, then the whole (if properly objected to) is inadmissible; in other words, it is for the proponent to sever the good and the bad parts."

In Wilson Storage & Transfer Co. v. Geurkink, 242 Minn. 60, 64 N.W. (2d) 9, 15, 48 A.L.R. (2d) 223, the court stated the rule as follows:

"It is a well-settled rule of law that where a general offer of evidence is made and some of the evidence is material and admissible and other parts of it are immaterial or inadmissible the whole may be rejected in the absence of a specific offer of the admissible portion."

In Morey v. Redifer, 204 Or. 194, 197, 264 Pac. (2d) 418, 282 Pac. (2d) 1062, 1067, the court said:

"For the reason that the offer of proof contained testimony that was clearly objectionable, if for no other reason, the offer was properly rejected by the trial court. The objectionable por-

tions contaminated the whole. The trial court was not required to separate the good from the bad.''

The courts generally hold that where evidence is offered as a whole and part of it is inadmissible, it is discretionary with the trial court to either reject the entire evidence or receive those parts which are admissible and reject the rest, but it need not assume the duty of making the separation. 88 C.J.S., Trial, section 82, page 187. The same rule is applicable to criminal cases. 23 C.J.S., Criminal Law, section 1031, page 408.

I think the so-called dying declaration contained inadmissible and highly prejudicial matter which should either have been excluded separately or the entire declaration rejected.

Furthermore I think the whole of the so-called dying declaration was inadmissible. The ultimate test in determining the admissibility of such a declaration is: Did the declarant believe at the time of making the declaration that death was imminent? State v. Martin, 76 Mont. 565, 248, Pac. 176, and authorities therein cited. Here, I think, the declarant did not entertain that belief.

It is true that the attending physician thought declarant was about to die and told declarant so, the night before the statement was made, but it is not the doctor's mind but that of declarant that determines the issue. Also last religious rites were conducted at the suggestion of the physician. But, after these rites were administered, declarant complained of being questioned and pestered for a statement and protested and asked to be left alone lest he have a ''nervous breakdown'' and stated, ''I will tell it all when I get well.'' This indicates to my mind that declarant expected to recover and not that he was certain imminent death was at hand.

It is true declarant also stated on the forenoon of June 20th, ''I am going down for the long count'', and made the statement to his physician the night before the declaration was made ''I am going to die'', but these statements, when considered with the other statements made by him thereafter,

do not indicate that at the time the declaration was made all hope of recovery had been abandoned.

"No matter how strong expression of the certainty of death may be, if there be any evidence of hope, in the language or actions of the declarant, his statements will be rejected." Morgan v. State, 31 Ind. 193, 199.

In State v. Medlicott, 9 Kan. 257, a man by the name of Ruth was found dead on the morning of April 27, 1871. The following note in his handwriting was found in a book lying upon his coat on the piano on April 27th:

"Darling: The Doctor—I mean Dr. Medlicott—gave me a quinine powder Wednesday night, April 26. The effects are these: I have a terrible sensation of a rush of blood to the head, and my skin burns and itches. I am becoming numb and blind. I can hardly hold my pencil, and I cannot keep my mind steady. Perspiration stands out all over my body, and I feel terribly. The clock has just struck eleven, and I took the medicine about 10:30 p.m. I write this so that if I never see you again you may have my body examined and see what the matter is. Good-bye, and ever remember my last thoughts were of you. I cannot see to write more. God bless you, and may we meet in heaven. Your loving Hubbie, I. M. Ruth."

The court held that declaration inadmissible as a dying declaration since it did not clearly appear that when the statement was written the writer had lost all hope of life. That was a stronger case supporting the admissibility of the statement than the instant case, for there the statement was voluntarily made and without urging on the part of anyone.

In State v. Casey, 212 N.C. 352, 193 S.E. 411, 412, it was held that the statement by deceased a short time before his death "'if you don't do something for me, I am going to die right now'" was not a sufficient foundation for a dying declaration. The court rested its conclusion on the statement from 1 R.C.L., page 539, paragraph 82, reading: "'An undoubting belief existing in the mind of the declarant at the time the

declarations are made, that the finger of death is upon him, is indispensible to that sanction which the law exacts and therefore if it shall appear, in any mode, that there was a hope of recovery, however faint it may have been, still lingering in his breast, that sanction is not afforded, and his statement cannot be received'."

That this species of evidence should always be received with the greatest caution since declarant is not under oath or subject to cross-examination was pointed out by the court in People v. Hodgdon, 55 Cal. 72, 36 Am. Rep. 30, where the court held it was error to receive the following declaration in evidence though declarant died within an hour after making it:

"Dying statement of Mrs. Emma Downs. Believing I am very near death, and realizing that I may not recover, I wish to make this, my dying statement, as to the cause of my death; and I now, in the presence of these witnesses, charge Mrs. Hodgdon, on Howard street, between Sixth and Seventh streets, with having been the sole cause of my death; in that she did at three several times, and lastly, that on yesterday, the 14th day of March, 1878, did use an instrument or implement on my person for the purpose of and producing an abortion, and that she and no other person is to blame in the matter. This being my voluntary statement. Mrs. Emma Downs.

"Witness: F. B. H. Wing, M.D.; John Wagner, M.D.

"San Francisco, March 15th, 1878."

The United States Supreme Court, speaking through Mr. Justice Cardozo, in Shephard v. United States, 290 U.S. 96, 54 S. Ct. 22, 24, 78 L. Ed. 196, stated the requirement for admissibility as follows:

"Fear or even belief that illness will end in death will not avail of itself to make a dying declaration. There must be a settled hopeless expectation' [citing authority] that death is near at hand, and what is said must have been spoken in the hush of its impending presence. [Citing many authorities.]"

In that case there was evidence that declarant had said "'She was not going to get well; she was going to die'."

Here the statement now relied on was not even considered as a dying statement by Dr. Molloy who related the statement before the jury. He testified, ''It wasn't taken as a dying statement as far as I am concerned the night before. He was just talking to his doctor.''

In my opinion the so-called dying declaration was not in fact a dying statement and should have been excluded.

I express no opinion as to whether we should follow the case of People v. Ferlin, 203 Cal. 587, 265 Pac. 230. All that I have to say in connection with that subject is that none of the cases cited in either of the foregoing opinions considers facts such as we have here.

In the Ferlin case, defendant had employed Hill to burn a building. Hill, without defendant's knowledge took Skala in on the enterprise. Skala lost his life in the endeavor. The court, in effect, held that Ferlin was not guilty of murdering Skala. Similar facts are here involved. Defendant did not conspire with Bishop. Defendant and Bishop were not co-conspirators. Bishop injected himself into the case as a volunteer without the knowledge of the defendant. According to his own story he volunteered to furnish the courage which Freestone lacked. He was not an innocent bystander for whose protection R.C.M. 1947, section 94-2503, was enacted.

The conspiracy between defendant and Freestone did not contemplate the bringing in of volunteers to supply the courage to accomplish the arson. If we do not follow the Ferlin case here it is not because other courts take a contrary view on like facts. I know of no other case treating of similar facts.

In view of the majority opinion here, no useful purpose would be subserved for me to express any conclusion as to whether the opinion in the Ferlin case is sound.

On Motion for Rehearing

PER CURIAM.

At the time of the oral argument and submission of this

46

■ appeal, and at the time the decision herein was rendered, this court consisted of Mr. Chief Justice Hugh Adair and Associate Justices R. V. Bottomly, Horace S. Davis, Albert H. Angstman and Forrest H. Anderson, all of whom heard the oral arguments on the appeal and thereafter participated in the consideration of the case.

The decision of the court affirming the trial court's judgment and its order denying appellant's motion for a new trial was rendered and pronounced on January 4, 1957. The opinion of the court was written by Chief Justice Adair and the disposition of the case therein made was concurred in by Justices Bottomly and Davis, while Justices Anderson and Angstman dissented.

On January 7, 1957, Justice Anderson qualified for and assumed the office of Attorney General of the State, to which he had been duly elected, and the Honorable Wesley Castles, on appointment of the Governor, qualified for and now fills the vacancy on this court so occasioned. On the same day, Justice Davis completed the term of his appointment and retired from the court being succeeded by Justice Adair who then and there qualified for and assumed the office of associate justice to which he had been duly elected. Whereupon, on January 7, 1957, the Honorable James T. Harrison, on appointment of the Governor, qualified for and assumed the office of Chief Justice on this court.

Thereafter, on January 11, 1957, on motion of counsel for the appellant, Lawrence R. Morran, this court, by order made and signed by Justices Adair, Bottomly and Angstman granted the appellant further time beyond, and in addition to, that provided by court rule within which to serve and file a motion for a rehearing herein.

On January 22, 1957, appellant served and filed his motion for a rehearing herein, and on January 28, 1957, the Attorney General served and filed objections to appellant's motion and to the granting thereof.

Neither Chief Justice Harrison nor Mr. Justice Castles parti-

cipated in granting the extension of time for the filing of appellant's motion for a rehearing, nor in the consideration of such motion, each having become a member of this court subsequent to the argument and submission of the appeal and subsequent to the determination of the case on its merits.

On the question being put, *Shall appellant's motion for rehearing be granted?* the members of this court serving at the time of the argument, submission and determination of the case on its merits decided as follows: *In the affirmative:* Justice Angstman and *In the negative:* Justices Adair and Bottomly, wherefore appellant's motion for rehearing failed and the justices voting in the negative being of the opinion that the motion for a rehearing does not present any proposition or question which was not fully considered by the court in rendering its decision, and nothing being presented to change the opinion of any member of this court who participated in the original decision upon the question decided, the motion for rehearing is denied, remittitur to issue forthwith. Gas Products Co. v. Rankin, 63 Mont. 372, 395, 398, 207 Pac. 993, 999, 1000, 24 A.L.R. 294.